FILED
United States Court of Appeals
Tenth Circuit

August 12, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LOUIS C. PRAGER, a Nevada resident,

Plaintiff - Appellee,

and

REBECCA PRAGER, a Nevada resident,

Plaintiff – Appellee/
Cross-Appellant,

v.

CAMPBELL COUNTY MEMORIAL
HOSPITAL, a Wyoming Governmental
Entity; BRIAN M. CULLISON, M.D., a
Wyoming resident,

Defendants – Appellants/
Cross-Appellees.

Nos. 11-8102 & 12-8027
(D.C. No. 1:10-CV-00202-ABJ)
(D. Wyo.)

_____

**ORDER**
_____

Before **KELLY**, **HOLLOWAY**, and **MATHESON**, Circuit Judges.
_____

Appellees have filed a motion to publish the order and judgment previously issued

on July 2, 2013. Appellants have filed a response in opposition. After consideration, the

motion is granted. The published opinion is filed nunc pro tunc to that date, and a copy is

attached.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

July 2, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

LOUIS C. PRAGER, a Nevada resident,

    Plaintiff - Appellee,

and

REBECCA PRAGER, a Nevada resident,

    Plaintiff – Appellee/
    Cross-Appellant,

v.

CAMPBELL COUNTY MEMORIAL
HOSPITAL, a Wyoming Governmental
Entity; BRIAN M. CULLISON, M.D., a
Wyoming resident,

    Defendants – Appellants/
    Cross-Appellees.

Nos. 11-8102 & 12-8027

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 1:10-CV-00202-ABJ)

Robert Todd Ingram, Ingram Olheiser, P.C., Casper, Wyoming, (Scott J. Olheiser,
Ingram Olheiser, P.C., Casper, Wyoming, and T. Thomas Metier, Metier Law Firm, Fort
Collins, Colorado, with him on the briefs) appearing for Appellees.

Billie L.M. Addleman, (Richard G. Schneebeck and Melissa R. Skorcz with him on the
briefs), Hirst Applegate, LLP, Cheyenne, Wyoming, appearing for Appellants.

Before **KELLY, HOLLOWAY,** and **MATHESON,** Circuit Judges.

**HOLLOWAY**, Circuit Judge.

This appeal arises from a diversity action based on a claim of medical negligence. The injured plaintiff, Louis Prager, alleged that Campbell County Memorial Hospital and its employee, Dr. Brian Cullison (together, the Hospital Defendants), negligently failed to diagnose Mr. Prager's broken neck following an automobile accident, resulting in serious nerve damage to his left arm. After a lengthy trial, the jury in the case awarded damages to Mr. Prager. Mr. Prager's wife, Becky, was awarded damages for loss of consortium. The jury awarded a verdict for seven million dollars to Mr. Prager and a verdict for two million dollars to Ms. Prager. Displeased with the jury's decision, the Hospital Defendants asked the district court to order a new trial or else reduce the Pragers' award of damages. The district court declined to disturb the verdict in favor of Mr. Prager but ordered Ms. Prager's damages reduced by 75%, to $500,000.

The Hospital Defendants now appeal the judgment in favor of the Pragers. Ms. Prager, in turn, cross-appeals the district court's remittitur of her loss-of-consortium award. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the judgment in favor of Mr. Prager and REVERSE the district court's remittitur of Ms. Prager's damages, with instructions to reinstate the full amount of the jury's award.

# I. BACKGROUND

## A. *The Facts*

On an icy Wyoming morning in 2008, the truck that Louis Prager was driving skidded, rolled five times, and eventually came to rest upside down in the snow. It was a bad wreck.[1] When emergency personnel arrived at the scene of the accident, they found Mr. Prager bloodied but conscious. He had a serious cut under his left eye. Mr. Prager told the paramedics that he was also experiencing pain "on the left side of his neck and shoulder." Aplee. Supp. App. at 1644. Because a person in a rollover car crash is at high risk of suffering spinal injury, the emergency responders secured Mr. Prager to a backboard and placed a cervical collar—essentially, a neck brace—around his neck. This was done to support his head and neck and prevent movement until the full extent of his injuries could be ascertained at a hospital.

An ambulance took Mr. Prager to the emergency room at Campbell County Memorial Hospital, located nearby in the town of Gillette. He was met there by the attending emergency-room technician, Lisa Harry, who recorded that Mr. Prager was complaining of neck pain upon his arrival at 8:55 A.M. Sher Watt, a Registered Nurse, then came in to assess Mr. Prager's injuries. Nurse Watt, too, indicated on her nursing chart that Mr. Prager was complaining of neck pain when he first came to the emergency room.

---

[1] There is no suggestion that Mr. Prager was intoxicated, under the influence of a controlled substance, or driving recklessly.

Much of what happened after this point is hotly disputed by the parties. Two distinct and irreconcilable narratives emerged at trial. As the Hospital Defendants tell it, Dr. Cullison, who was the attending emergency-room physician that day, examined Mr. Prager shortly after his arrival at the hospital. In this version of events, Dr. Cullison first loosened Mr. Prager's cervical collar and then made a thorough physical examination of his neck and cervical spine by following a standard procedure known as the NEXUS protocol.[2] Having gone through all of the NEXUS criteria, Dr. Cullison was then able to "clear" Mr. Prager's cervical spine. In layperson's terms, Dr. Cullison's examination had ruled out the existence of a neck injury for Mr. Prager. This also meant, according to Dr. Cullison, that an x-ray of Mr. Prager's cervical spine would not be required: Mr. Prager's neck appeared fine.

Even so, Mr. Prager had sustained a facial laceration and was also complaining of pain around his left shoulder and tenderness in his back. Dr. Cullison testified that, for these reasons, he ordered CT films of Mr. Prager's head and facial bones, along with an x-ray and CT film of Mr. Prager's thoracic spine.[3] Dr. Cullison ordered the first two

---

[2] Here, the term "cervical" means "pertaining to the neck." Dorland's Illustrated Medical Dictionary at 333 (32d ed. 2012). The cervical spine comprises the vertebrae immediately below the skull. "NEXUS" is short for "National Emergency X-Radiography Utilization Study." The NEXUS protocol requires that five factors be satisfied before a patient can be cleared for a neck injury: (1) no midline cervical tenderness; (2) no focal neurologic deficit; (3) normal alertness; (4) no intoxication; and (5) no painful distracting injury. *See* Aplt. Br. at 26.

[3] "CT" is an abbreviation of "computed tomography." Dorland's Illustrated Medical Dictionary at 440. Dr. Cullison explained the basic difference between x-rays and CT films:
(continued…)

4

films to rule out the existence of a skull fracture or the presence of foreign bodies, such as dirt or glass, that might have become imbedded in Mr. Prager's facial wounds. The second two films were ordered to see what injury, if any, Mr. Prager had suffered to his shoulder or midsection. The x-rays and CT films showed no broken bones. Satisfied that Mr. Prager had suffered no serious injuries, Dr. Cullison stitched up the cut on Mr. Prager's face and discharged him from Campbell County Memorial Hospital early that afternoon.

Mr. Prager tells things differently. He testified at trial that he never saw Dr. Cullison until around 1:30 that afternoon, when Dr. Cullison came to stitch up the facial laceration. It was not until this time, Mr. Prager says, that Dr. Cullison removed the cervical collar from around his neck. Mr. Prager testified that he had been wearing the cervical collar all day and that the collar was still on him while the x-rays and CT films were being made earlier that day. According to Mr. Prager, Dr. Cullison then told him that "we checked all the x-rays and you have no broken bones." *Id.* at 1019. Mr. Prager stated that he continued to complain of neck pain during this time, but Dr. Cullison "reassured me that . . . everything was okay." *Id.* at 1021. Mr. Prager told the jury that

---

> Essentially, . . . a plain film x-ray is like taking probably what most people are familiar [with], like a picture of the bones or a picture of the spine, whereas the CT generates usually about a hundred to 200 and actually these days up to a thousand x-rays . . . . And so it's a little bit more specialized.

Aplt. App. at 1772. The term "thoracic" means "pertaining to or affecting the thorax (chest)." Dorland's Illustrated Medical Dictionary at 1920. The thoracic spine comprises the middle segment of the spine and is located immediately below the cervical spine.

Dr. Cullison never physically examined his neck at any time before discharging him from the hospital.

Mr. Prager went to a friend's house to recuperate. Mr. Prager is a resident of Las Vegas, Nevada, but he had been living in Gillette for the previous five months, working on drilling rigs for an energy company. Mr. Prager never planned on permanently staying in Wyoming; he had temporarily moved there to learn "the drilling side of the oil business," *id.* at 991, with the ultimate aim of becoming a drilling consultant—something he thought would make a potentially lucrative enterprise. In the meantime, Ms. Prager had remained at their home in Las Vegas, where she teaches middle school and helps in raising their young granddaughter. To be clear, the Pragers emphasize that they were not living separately because of marital strife: Mr. Prager simply had a job to do, and that job had taken him to Wyoming for the time being.

Mr. Prager had started settling in at his friend's house when something went very wrong. He wrecked the truck on a Tuesday; after being discharged from the hospital, he spent Tuesday afternoon and all of Wednesday in bed. When he finally got up to use the bathroom early in the morning on Thursday, a blinding pain overtook him. He says that "it was like a bolt of lightning went off in my head." *Id.* at 1033. He felt a searing pain in his neck, and his left arm went numb. When the pain and numbness were no longer bearable, Mr. Prager returned to the emergency room at Campbell County Memorial Hospital. For the first time, x-rays were taken of his cervical spine. The x-rays showed that Mr. Prager's neck was, in fact, broken. *See id.* at 1040. Mr. Prager had a fracture around the fourth and fifth vertebrae of his cervical spine. He immediately underwent

6

emergency surgery. Some five weeks after his accident, Mr. Prager left Wyoming and returned home to his wife in Las Vegas.

Life has not been easy for the Pragers since the accident. Mr. Prager's neck and left shoulder are in constant pain. The pain is often severe. His left arm—formerly his dominant arm—sustained severe nerve damage and is essentially paralyzed. There is, the evidence showed, very little he can do with that arm anymore. Mr. Prager also has bad headaches and finds it difficult to sleep. He has not worked since the accident and has not adjusted well to his new reality of chronic pain and reduced physical ability. He is listless and depressed, and his involuntary sedentariness is often punctuated by bouts of anger born of frustration.

His marriage has suffered, too. Ms. Prager told the jury that her husband came home from Wyoming a changed man. He is oftentimes agitated and isolated, angry and withdrawn. She testified that their life today has become in large part defined by Mr. Prager's constant state of pain, and their physical and emotional intimacy has withered. Ms. Prager must now shoulder the main economic responsibilities of the household while also caring for her husband. She has begun taking medication for depression. It appears likely that Mr. Prager's condition is permanent.

### B. *The Litigation*

1.     **The Allegations and Testimony Concerning Negligence in Diagnosis**

In 2010, the Pragers brought this diversity suit against Dr. Cullison and Campbell County Memorial Hospital in federal district court in Wyoming. Mr. Prager alleged negligence, and Ms. Prager asserted a claim for loss of consortium. Mr. Prager claimed

the Hospital Defendants negligently failed to properly diagnose his broken neck once he was brought to the emergency room after the car crash. Mr. Prager said that soon after he started moving around following his initial discharge from the hospital by Dr. Cullison, the damaged vertebrae shifted and impinged on a nearby nerve root, thereby causing significant nerve damage to his left arm and shoulder. He alleged that—had the fracture been discovered on his first visit to the emergency room—he could have been immediately stabilized and treated, and the subsequent nerve damage would have been avoided.

At trial, the Pragers relied on the expert medical testimony of Dr. M. Scott Linscott, Jr., M.D., to establish the Hospital Defendants' negligence. Dr. Linscott is trained as an emergency-room physician. The Hospital Defendants did not object to the admission of Dr. Linscott as an expert in emergency medicine. Dr. Linscott testified at trial that the Hospital Defendants failed to meet the applicable standard of care in evaluating and treating Mr. Prager's injuries. He told the jury that, given the nature of Mr. Prager's accident and his documented complaint of neck pain in the emergency room, the Hospital Defendants violated the standard of care by not ordering radiological imaging of Mr. Prager's cervical spine. *See id.* at 108-09. Dr. Linscott further testified that, in these circumstances, the NEXUS protocol was not an adequate mechanism for identifying a possible cervical-spine fracture. *See id.* at 109.

2.    **The Jury Verdict**

The jury agreed with the Pragers and returned a verdict finding the Hospital Defendants negligent. The jury awarded seven million dollars in compensatory damages

8

to Mr. Prager and two million dollars to Ms. Prager for loss of consortium. The Hospital Defendants filed a post-trial motion asking the district court for a remittitur of the jury award or, in the alternative, a new trial. The district court did not reduce the amount of Mr. Prager's award. But the court found Ms. Prager's award excessive and supported only by "meager" evidence. Aplt. App. at 1402. The court thus pared her award for loss of consortium to $500,000. The Hospital Defendants now appeal the judgment in favor of the Pragers, asserting trial errors. Likewise, Ms. Prager cross-appeals the district court's remittitur of her loss-of-consortium award. We now turn to the arguments raised by the parties.

## II. ANALYSIS

### A. *The Award to Mr. Prager*

The Hospital Defendants believe the jury's verdict was "outrageous." Aplt. Br. at 2. They assert that a host of errors by the district court caused their defense to be hobbled, the jury to be misled, and their case to be irreparably prejudiced. In the main, the Hospital Defendants argue that the district court erred in (1) allowing Dr. Linscott to offer previously undisclosed opinions at trial; (2) permitting testimony that Mr. Prager had suffered a "traumatic brain injury"; (3) excluding evidence of collateral-source payments of Mr. Prager's medical bills; (4) letting Mr. Prager testify about the amounts of his medical bills without adequate personal knowledge of their contents; (5) denying them judgment as a matter of law regarding Mr. Prager's "speculative" damages; and (6) denying their post-trial motion for remittitur or, in the alternative, a new trial as to Mr. Prager's $7,000,000 in damages.

9

1.    **The Issue of Dr. Linscott's Testimony**

The Pragers called Dr. Linscott as their expert medical witness at trial.  Testifying in front of the jury, Dr. Linscott reviewed the radiological images of Mr. Prager's head that were taken at Campbell County Memorial Hospital on the day of his accident.  During the course of his testimony, Dr. Linscott expressed four opinions that the Hospital Defendants assert were erroneously admitted by the district court.  Dr. Linscott testified that (1) the radiological images made of Mr. Prager's head revealed a neck fracture; (2) the CT film showed the outline of a cervical collar, indicating that Dr. Cullison had not physically examined Mr. Prager's cervical spine before ordering the x-rays and CT imaging; (3) he did not believe that Dr. Cullison physically examined Mr. Prager's neck at any other time that day; and (4) the Hospital Defendants' version of the events that took place at the hospital that day was not credible.

The Hospital Defendants vigorously argue that Dr. Linscott's testimony was inadmissible in part because it consisted of new opinions that had not been disclosed to them prior to trial.  They contend that Dr. Linscott's trial statements exceeded the scope of his anticipated testimony, as established in the Pragers' pretrial disclosures and in Dr. Linscott's deposition testimony.  As such, the Hospital Defendants argue they were unfairly surprised at trial and thus prejudiced in their defense of the case.

a. *Standard of Review*

We review a district court's decisions on the admission or exclusion of evidence, including expert testimony, for abuse of discretion.  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 968 (10th Cir. 2001).  "A district court abuses its discretion

10

'when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" *Id.* (quoting *Copier* ex rel. *Lindsey v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998)). The abuse-of-discretion standard is "one which we have traditionally understood to mean that we will reverse a determination only if the court 'exceeded the bounds of permissible choice,' given the facts and the applicable law in the case at hand." *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007) (quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)). Taking this line of thought a piece further,

> we recognize that in many cases there will be a range of possible outcomes the facts and law at issue can fairly support; rather than pick and choose among them ourselves, we will defer to the district court's judgment so long as it falls within the realm of these rationally available choices.

*Id.*

Where no timely objection has been made to the introduction of evidence at trial, we instead will review the district court's rulings for plain error. *United States v. Magleby*, 241 F.3d 1306, 1315 (10th Cir. 2001). Under the plain-error standard, the party challenging the admission of evidence on appeal must show "(1) an 'error,' (2) that is 'plain,' which means 'clear' or 'obvious' under current law, and (3) that 'affect[s] substantial rights.'" *Id.* (quoting *United States v. Fabiano*, 169 F.3d 1299, 1303 (10th Cir. 1999)) (alteration in original). "If these three requirements are met, then we may exercise discretion to correct the error if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Fabiano*, 169 F.3d at 1303 (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)) (alteration in original).

Here, the Pragers urge us to apply plain-error review because, as they see it, the Hospital Defendants did not make proper and timely objections to Dr. Linscott's testimony at trial. We disagree. We acknowledge that, "in the heat of a trial," counsel might "not explain the evidentiary basis of his argument as thoroughly as might ideally be desired." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 174 (1988). But the key inquiry is whether trial counsel "substantially satisfied the requirement of putting the court on notice as to his concern." *Id.*

The Hospital Defendants wanted to keep the jury from hearing Dr. Linscott's interpretations of the radiological images. The objections hinged on whether Dr. Linscott was qualified as an expert beyond the field of emergency medicine and whether his testimony would contain new, previously undisclosed opinions. Before Dr. Linscott gave the challenged testimony, trial counsel engaged in a thorough colloquy with the district court outside the presence of the jury. The Hospital Defendants' counsel first stated to the court that

> [t]he basis for my objection is that, as we've previously submitted to the Court, Dr. Linscott has acknowledged here today that he's not a neurosurgeon, he's not a neurologist. He is not an orthopedic surgeon. He does not routinely treat these kinds of injuries. And I believe for Dr. Linscott to give an opinion with respect to the cause of this nerve injury is beyond the scope of his expertise . . . .

Aplee. Supp. App. at 116. The district court overruled this objection, and counsel followed by saying,

> Well, Your Honor, this raises another issue. When I took Dr. Linscott's deposition . . . he did not have and had not reviewed any of the radiologic images from this case. And I really didn't have an opportunity to ask him about that. And I believe that the line of questioning we're about to enter

12

into really goes beyond the scope both of his designation as an expert witness and beyond the scope of what I was reasonably given the opportunity to inquire of him about at his deposition.

*Id.* at 118. We are satisfied that the Hospital Defendants gave sufficient notice of their objections to the relevant portions of Dr. Linscott's testimony at trial. Accordingly, we review the district court's rulings on the admission of expert testimony for abuse of discretion.

b. *The Case of* Smith v. Ford Motor Company

On appeal, the Hospital Defendants argue that the admission of Dr. Linscott's testimony failed to satisfy the requirements set out by this court in *Smith v. Ford Motor Company*, 626 F.2d 784 (10th Cir. 1980). There, we overturned a sizeable jury award because we determined the district court had "erred in receiving the testimony of a crucial expert witness." *Id.* at 788. More specifically, we found the defendant, Ford Motor, was misled into believing that the additional testimony of a medical-expert witness would relate only to the nature of the plaintiff's injuries and not to those injuries' causal relationship to a defective seatbelt. *See id.* at 797-800. In so holding, we "enunciated a series of factors which should be considered in determining whether a district court has abused its discretion in excluding, or in our case allowing, testimony not specified in the pretrial order." *Id.* at 797. These factors are:

> "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order."

13

*Id.* (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 595 F.2d 894, 904-05 (3d Cir. 1977), *abrogated on other grounds by Wilson v. Garcia*, 471 U.S. 261 (1985), *as recognized in Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985)).

The Hospital Defendants' core argument on this point is that their defense of the case was gravely prejudiced by the inclusion of new opinion testimony by Dr. Linscott. The Hospital Defendants correctly point out that the Pragers were required by the district court to provide them in advance of trial with a meaningful description of the anticipated testimony of each expert witness. This description was to include "a comprehensive statement of the expert's opinions and the basis for the opinions." Aplt. App. at 64-65. These initial disclosures were to be fleshed out at the depositions of the designated experts. The Hospital Defendants believe the Pragers did not play fair at trial with their use of Dr. Linscott's opinions.

Looking back to the pretrial disclosures, it appears the Hospital Defendants expected Dr. Linscott to testify on the applicable standard of care and their alleged deviations from the standard of care. Dr. Linscott was also to explain the findings contained in his expert report, which was based in part on his review of Mr. Prager's hospital records. The Hospital Defendants assert that Dr. Linscott's testimony went outside those boundaries and should not have been admitted by the district court. In fine, the Hospital Defendants believe they were ambushed by Dr. Linscott's testimony. In their version of things, Dr. Linscott's testimony gave the Pragers a potent strategic advantage at trial, and the Hospital Defendants' defense never recovered from the surprise of that testimony.

The Pragers counter by saying the Hospital Defendants have feigned genuine surprise at the admission of the challenged portions of Dr. Linscott's testimony and greatly exaggerated their claims of prejudice. They further argue that much of the substance of the challenged testimony was presented to the jury by other witnesses at trial and in those instances went unchallenged. We acknowledge the general rule that "unless the court modified its pretrial order, the parties are bound to its contents and may not contradict its terms. This rule, of course, applies to those portions of pretrial orders which list the witnesses and describe the testimony each party may use." *Perry v. Winspur*, 782 F.2d 893, 894 (10th Cir. 1986). "Nevertheless, the decision to allow or prohibit testimony or witnesses not described or listed in the pretrial order rests with the sound discretion of the trial judge and will not be disturbed except for abuse of discretion." *Id.*

We think the trial judge's evidentiary rulings landed "within the realm of . . . rationally available choices" in the context of this litigation. *McComb*, 519 F.3d at 1053. Under the facts and circumstances presented in this case, we agree with the Pragers that the Hospital Defendants were neither surprised nor prejudiced by the inclusion of Dr. Linscott's new opinion testimony. The district court did not abuse its discretion in admitting the testimony, and this case does not run afoul of *Smith*'s directive.

c. *Analysis Under* Smith

First, we are not persuaded that the Hospital Defendants were prejudiced or surprised in fact by the district court's ruling. The Hospital Defendants were already aware of Dr. Linscott's opinion that Mr. Prager had been brought to the emergency room

15

with a fractured neck. Indeed, the fact of the fracture itself was not in dispute at trial, and counsel for the Hospital Defendants conceded as much in his opening statement to the jury.[4] Thus, we do not find it genuinely surprising that, once presented with a radiological image showing Mr. Prager's head, Dr. Linscott would testify that he believed it revealed the existence of a fracture. *See* Aplee. Supp. App. at 133-35. To be sure, Dr. Linscott supplemented his original opinion at trial inasmuch as he had not previously stated an opinion on what the images, once displayed, would show. But, in this case, the supplement could not realistically be considered a surprise. This sets Dr. Linscott's testimony apart from that of the challenged expert witness in *Smith*, who surprised the defendant in that case with a previously undisclosed (and devastating) opinion on a causal link to damages.

Moreover, all radiological images of Mr. Prager taken on the day of his accident had been in the Hospital Defendants' possession since the beginning of the litigation. In light of the extensive motion practice and discovery that took place after this suit was filed, it strikes us—as it did the district court—as unlikely the Hospital Defendants would

---

[4] In his deposition testimony, Dr. Cullison stated his belief that Mr. Prager did not have a fractured neck when he was brought to the emergency room on the morning of the accident. At trial, the Hospital Defendants acknowledged the fracture but argued they had nevertheless satisfied the applicable standard of care in evaluating Mr. Prager's post-accident injuries. *See* Aplt. Br. at 41 ("Dr. Cullison's defense in this case was that he performed the appropriate examination of Plaintiff and that, while Mr. Prager's outcome was unfortunate, Dr. Cullison met the standard of care in his examination.").

16

not have anticipated that the radiological images (and any conflicting interpretations about what those images revealed) might be placed in issue at trial.[5]

We also note that counsel for the Pragers had requested copies of those same radiological images for Dr. Linscott to review in advance of his deposition. *See id.* at 121-22. The Hospital Defendants provided a copy of the images on a computer disc, but the file containing the images would not open, and Dr. Linscott was unable to look at them. It seems largely for this reason that Dr. Linscott was never questioned at his deposition on his possible opinions concerning the images. He was, however, cross-examined at the deposition by the Hospital Defendants' counsel over the written reports on Mr. Prager's injuries. The written reports include an evaluation of the results of the x-rays and CT films. And, at some time after Dr. Linscott's deposition but before the trial, counsel for the Hospital Defendants sent a viewable, glitch-free computer disc containing the radiological images to the Pragers' counsel. None of this convincingly suggests that an ambush was afoot.

---

[5] In denying the Hospital Defendants' trial motion to strike Dr. Linscott's challenged testimony, the district court pointedly observed:

> Well, it's just absolutely shocking to me that these films have been in possession of the defendant all of this time, and they've had the opportunity to have how many radiologists there are in the country to look at them and debate whether or not there is a fracture that is shown in those . . . radiological films that were developed by their own hospital and are totally amazed that Dr. Linscott has revealed, once he could see the films that they produced, he feels that there's a fracture there, and it was not covered or discussed in the deposition that was taken months before the time that they were able to provide a film that he could examine and look at.

Aplee. Supp. App. at 177-78.

The Hospital Defendants also object to Dr. Linscott's testimony that (1) the CT films indicate Mr. Prager was still wearing his cervical collar when the images were taken, and (2) Dr. Cullison never physically examined Mr. Prager's neck. This contradicts the testimony by some of the Hospital Defendants' witnesses that Dr. Cullison physically examined Mr. Prager's neck, "cleared" it according to the NEXUS protocol, and then removed the cervical collar before sending him to radiology for facial and thoracic (but not cervical) imaging on the morning of the accident.

Again, Dr. Linscott's testimony here could not have been legitimately surprising. Mr. Prager had said all along that he never saw Dr. Cullison until later that afternoon, after all of the radiological images had already been taken. According to Mr. Prager, it was only then that his cervical collar was taken off. This was Mr. Prager's testimony at trial, and it was corroborated by the trial testimony of Corey Edwards, a coworker of Mr. Prager's, who was with him at the hospital. And Dr. Linscott had already testified at his deposition that he did not believe Dr. Cullison physically examined Mr. Prager's neck. As before, the element of genuine surprise—and therefore prejudice—is lacking.

Having reviewed the transcript of trial testimony, we are also satisfied that the Hospital Defendants had adequate time to thoroughly and effectively cross-examine Dr. Linscott and to present their own expert witness in rebuttal of his testimony. Neither the district court's ruling that allowed Dr. Linscott's challenged testimony, the cross-examination of Dr. Linscott, nor the testimony of the rebuttal witness caused any disruption to "the orderly and efficient trial of the case." *Smith*, 626 F.2d at 797. Finally, we discern no bad faith or willfulness in the Pragers' actions at trial. Because the

18

Hospital Defendants were not surprised or prejudiced by the district court's ruling on this issue, there was no abuse of discretion in admitting Dr. Linscott's testimony.[6]

## 2. The Challenged References to Mr. Prager's "Traumatic Brain Injury"

The Hospital Defendants also assert the district court erred in allowing several references at trial to a possible "traumatic brain injury" suffered by Mr. Prager. They say the Pragers violated the district court's pretrial order by referring to it. We find this argument misleading. The district court's pretrial order stated that the Pragers could not "refer to or make claims of *permanent* traumatic injury of the brain." Aplt. App. at 1086 (emphasis added). Nobody alleged at trial that Mr. Prager had suffered a permanent brain injury. Any mention of brain injury came within the proper context of discussing whether Mr. Prager might have been experiencing the effects of a concussion or similar head trauma immediately after his accident, during which he is believed to have briefly lost consciousness. In this case, the term "traumatic brain injury" was appropriately intended to be synonymous with a "concussion." *See* http://www.cdc.gov/concussion ("A concussion is a type of traumatic brain injury . . . ."); *see also* Aplee. Supp. App. at 88-89 (testimony of Dr. Linscott that "loss of consciousness basically means that the patient has had a, what we call, the lay term is concussion. The medical term is mild traumatic brain injury."). This claim of error is without merit.

---

[6] The Hospital Defendants also argue that the district court abused its discretion in allowing testimony by Dr. Linscott that Nurse Watt and Dr. Cullison lied. There is no basis to these arguments. The Hospital Defendants objected to Dr. Linscott's testimony that Nurse Watt lied, and the district court instructed the jury to disregard the remark. The Hospital Defendants fail to point to any testimony in the record by Dr. Linscott that Dr. Cullison lied.

3.      **The Exclusion of Evidence of Collateral-Source Payments**

The Hospital Defendants also argue the district court erred in excluding evidence of payments made by Wyoming Workers' Compensation to Mr. Prager's medical-care providers.  The providers had accepted payment from Workers' Compensation of less than the full amount billed, and the Hospital Defendants wanted to introduce evidence to the jury of this lesser, or discounted, amount.  The district court correctly applied the collateral-source rule in keeping out evidence of the discounted payments.

The collateral-source rule, which derives from the common law, holds that "[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." *Friedland v.TIC-The Indus. Co.*, 566 F.3d 1203, 1205-06 (10th Cir. 2009) (quoting Restatement (Second) of Torts § 920(A)(2) (1979)).  "The rule thus permits an injured plaintiff to recover more than the damages he has suffered as the result of an injury . . . ." *Id.* at 1206.  This is because "public policy favors giving the plaintiff a double recovery rather than allowing a wrongdoer to enjoy reduced liability simply because the plaintiff received compensation from an independent source." *Green v. Denver & Rio Grande W. R.R. Co.*, 59 F.3d 1029, 1032 (10th Cir. 1995).

The Hospital Defendants contend that evidence of medical-provider discounts or write-offs extended to an insurer (such as Workers' Compensation) should not fall under the collateral-source rule.  As they see it, the lesser amount accepted by the providers is a more accurate reflection of Mr. Prager's medical expenses, and that amount should be considered by the jury in determining a reasonable quantum of damages.  But this

position conflicts with a fundamental tenet of the collateral-source rule: that a tortfeasor may not reap the benefit of any special payment arrangement involving a collateral source. As one state supreme court to examine this issue has aptly observed:

> We recognize that there may be a disparity between the cost of medical services that are billed to a consumer and the amounts that are actually paid by insurance companies. It can be tempting to treat the discounted amounts as being a truer reflection of a plaintiff's damages. However, the write offs reflect the negotiating power of [the plaintiff]'s insurer and its successful leverage in requiring providers to accept discounted reimbursement . . . .

*Volunteers of Am. Colo. Branch v. Gardenswartz*, 242 P.3d 1080, 1087 (Colo. 2010). We think that to limit Mr. Prager's damages to the amount paid by Workers' Compensation would confer an unintended and inappropriate benefit on the Hospital Defendants.

Any discounts or write-offs reflected in Mr. Prager's medical bills were a benefit that came as a direct result of negotiations with those providers by Workers' Compensation—a source independent of the Hospital Defendants. This places the payments squarely within the collateral-source rule. "The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him." Restatement (Second) of Torts § 920A cmt. b. We hold that the Hospital Defendants, as tortfeasors, may not receive any consideration or benefit stemming from the discounts or write-offs. There was no abuse of discretion by the district court in excluding the evidence of Wyoming Workers' Compensation payments.

4.    **Mr. Prager's Testimony on Medical Expenses**

At trial, Mr. Prager testified about the total amount of his medical expenses. The Hospital Defendants argue that his testimony was improperly admitted, saying that Mr.

Prager lacked the proper foundational knowledge concerning his bills. Under the specific facts presented, we do not think the district court erred in admitting his testimony. First, the medical billings had already been exchanged between the parties during the course of discovery. Second, the billing documents were available in the courtroom during Mr. Prager's testimony and could readily have been examined or discussed, if any party deemed it necessary to do so. Finally, one of Mr. Prager's medical experts, Dr. John Siegler, had also testified as to the reasonableness of the bills. The district court did not abuse its discretion in allowing the testimony.

5.     **The District Court's Denial of Judgment as a Matter of Law**

There is a medical device known as a spinal-cord stimulator, which is implanted in some patients as a way of controlling chronic pain. Dr. Siegler testified that (due to the nature of Mr. Prager's injuries and ongoing pain) it was reasonably likely that Mr. Prager would eventually be implanted with a spinal-cord stimulator as a necessary component of his medical treatment. Calling Dr. Siegler's testimony impermissibly speculative, the Hospital Defendants moved for judgment as a matter of law on this claim under Federal Rule of Civil Procedure 50(a). The district court denied the motion.

We review *de novo* a district court's denial of a motion for judgment as a matter of law, applying the same legal standard used by the district court. *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1243-44 (10th Cir. 2009). "In diversity cases, the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate."

22

*Haberman v. Hartford Ins. Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006). We will reverse a district court's denial of a motion for judgment as a matter of law "if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Wagner*, 586 F.3d at 1244 (quotation omitted). Finally, "[i]t is not our province to 'weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury.'" *Id.* (quoting *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1269) (10th Cir. 2008)).

Wyoming law prescribes a "reasonable degree of medical probability" standard for expert testimony on future medical expenses. *See Rudy v. Bossard*, 997 P.2d 480, 485 (Wyo. 2000) ("Ultimately, we must determine whether the doctor conveyed that it was more likely than not that the patient would require future medical treatment."). We believe that Dr. Siegler adequately conveyed to the jury—to a reasonable degree of medical probability—his professional opinion that Mr. Prager would at some point require implantation of the device. *See* Aplee. Supp. App. at 585; *see also id.* at 632 (testimony of Dr. Siegler that "it is more likely than not he will end up getting the stimulator placed. . . . And I hope that he doesn't need to do it. I hope surgery cures him, but I just don't think that's likely."). Dr. Siegler was vigorously cross-examined on these opinions by the Hospital Defendants. Having reviewed the pertinent expert testimony, we cannot say with confidence that "the evidence points but one way." *Wagner*, 586 F.3d at 1244. The question was one for the jury to weigh and ultimately decide. We do not disturb the district court's denial of the Hospital Defendants' motion for judgment as a matter of law.

6.      **The Hospital Defendants' Post-trial Motion on Mr. Prager's Damages**

As a final volley, the Hospital Defendants challenge the district court's denial of their post-trial motion for remittitur or, in the alternative, a new trial as to Mr. Prager's $7,000,000 in damages. The Hospital Defendants filed their notice of appeal while this post-trial motion was still pending. Their premature notice of appeal ripened once the district court ruled on the pending motion, giving us jurisdiction to review the orders specified in that notice. *See Breeden v. ABF Freight Sys., Inc.*, 115 F.3d 749, 752 (10th Cir. 1997). But because the Hospital Defendants failed to file an amended notice of appeal once the district court disposed of the post-trial motion, we lack jurisdiction to consider their challenge to the district court's denial of the motion as to Mr. Prager's damages. *Id.*; *see also Laurino v. Tate*, 220 F.3d 1213, 1219 (10th Cir. 2000).

Even if we had jurisdiction to review the denial of the post-trial motion as to Mr. Prager, there is ample evidence in the record of the pain and suffering experienced by Mr. Prager as a result of the undiagnosed cervical-spine fracture. There is also significant evidence indicating that his pain and suffering will to some extent follow him for the rest of his life.[7] The district court did not err in denying the Hospital Defendants' post-trial motion on Mr. Prager's damages award. The verdict for Mr. Prager will stand.

---

[7] Mr. Prager's remaining life expectancy, post-accident, is estimated at another 26.7 years. *See* Aplee. Supp. App. at 633-34. Mr. Prager was fifty-one years of age at the time of the events giving rise to this action.

## B. *The Remittitur of Ms. Prager's Damages*

Trial by jury is the bedrock right of our legal system. *See Jacob v. City of N.Y.*, 315 U.S. 752, 752-53 (1942) ("The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts."). Juries, being human, may at times fall victim to excess and error. In this case, the district court determined the jury's award to Ms. Prager of two million dollars for loss of consortium to be excessive, unreasonable, and unsupported by the weight of the evidence. Finding $500,000 to be the more appropriate measure of her damages, the district court cut down her award accordingly. Here, we must find fault with the court and not the jury. The district court overreached in this case, improperly re-weighing the evidence and intruding on the rightful province of the jury.

To be sure, a district court acts within its discretion in ordering a remittitur of damages that are so grossly excessive as to shock the judicial conscience.[8] But, after careful consideration, we do not think this is such a case. "We review the trial court's

---

[8] In the 1935 case of *Dimick v. Schiedt*, the Supreme Court concluded—albeit rather halfheartedly—that the practice of remittitur was constitutionally sound under the Seventh Amendment. 293 U.S. 474, 484-85 ("[I]t therefore may be that, if the question of remittitur were now before us for the first time, it would be decided otherwise. But . . . the doctrine has been accepted as the law for more than a hundred years and uniformly applied in the federal courts during that time. And, as it finds some support in the practice of the English courts prior to the adoption of the Constitution, we may assume that in a case involving a remittitur, which this case does not, the doctrine would not be reconsidered or disturbed at this late day.").

decision regarding remittitur for an allegedly excessive damages award for an abuse of discretion." *Palmer v. City of Monticello*, 31 F.3d 1499, 1508 (10th Cir. 1994). A district court abuses its discretion in ordering a remittitur "when the size of the verdict turns upon conflicting evidence and the credibility of witnesses." *Id.* In a word, the jury's award is "inviolate." *Id.* And it remains inviolate "so long as it is not so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Id.* (quotations omitted); *see also M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009) (same).

In a diversity case, "state law governs the propriety of an award of damages"— that is, whether it is excessive or inadequate. *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1251 (10th Cir. 2000); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437-38 (1996) (same); *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001) (limiting abuse-of-discretion standard from *Gasperini* to compensatory damages). Wyoming courts have held that "'[i]f the verdict is so large or small that it shocks the judicial conscience, the court has not only the right, but the duty, to grant remittitur or additur accordingly.'" *Caterpillar Tractor Co. v. Donahue*, 674 P.2d 1276, 1289 (Wyo. 1983) (quoting *Cates v. Eddy*, 669 P.2d 912, 922 (Wyo. 1983)). The same courts have described their "extreme reluctance to modify jury verdicts." *Cates*, 669 P.2d at 920.

In an action for loss of consortium, damages may be awarded for "any loss or impairment of the other spouse's society, companionship, affection and sexual relations."

26

Restatement (Second) of Torts § 693 cmt. f.  In this case, the jury was properly instructed

that "[l]oss of consortium may include the loss of the injured person's services, society,

companionship, affection, love, advice, guidance, and/or sexual relations."  Aplee. Supp.

App. at 1647.  The jury was likewise instructed that

> [t]here is no formula the court can give you for the determination of
> damages for loss of consortium.  It is not necessary that any witness shall
> have expressed any opinion as to the dollar amount of these damages or any
> damages for loss of consortium.  Your award, if any, should be such as will
> fairly and adequately compensate the plaintiff Rebecca Prager.  *The amount
> awarded, if any, rests within your sound discretion and is for you to
> determine, taking into consideration the evidence in this case and from
> your knowledge, observation and experience in life.*

*Id.* at 1648 (emphasis added).  Significantly, "[t]hese are not matters of economic loss

susceptible of pecuniary proof, and their monetary value must be assessed by the jury."

Restatement (Second) of Torts § 693 cmt. f.

The jury heard extensive testimony from both Mr. and Ms. Prager about Mr.

Prager's physical and emotional injuries and the effect of those injuries on his marriage.

The Pragers have been married for a little more than thirty years.[9]  Ms. Prager told the

jury that she and Mr. Prager enjoyed a "strong intimate life" before Mr. Prager was

injured.  Aplee. Supp. App. at 1205.  Her trial testimony gave an account of a marriage

defined by mutually fulfilling companionship.  Theirs seemed to be an ordinary marriage

in the best sense of the word: they worked, raised a family, took vacations, shared each

other's company, and planned on growing old together.  In the evenings and on the

---

[9] The record does not disclose the exact date of the Pragers' marriage, but Ms. Prager testified in October 2011 that they had at that point been married for thirty years.

weekends, they would go on walks, to the movies, or to the park.  At night, they would go to bed together.

Things have changed.  Ms. Prager said of her husband's return home that "[i]t was really sad to see him changed from when he left to go to Wyoming and then have him come back and look like an old man."  *Id.* at 1185.  A little later on, she underscored this same point, adding that "it's just really hard to see someone who was strong and hardworking to come back like an old man.  You know, he's not 51 anymore or 53 anymore.  He's 80."  *Id.* at 1194-95.  The Pragers' testimony reflects that their marriage now seems largely defined by the things that Mr. Prager can no longer do.  Mr. Prager is acutely aware of these limitations, and it eats away at him.  He remarked on this at trial: "I hate saying or even thinking that I'm, I'm any less of a man that I was before, but I guess I am, and that's hard for me to . . . to deal with."  *Id.* at 1060.  He went on to say that

> as far as I'm concerned, my life has been ruined.  I'm no longer the person I used to be, nor will I ever be.  And it hurts me, *it hurts my family*.  It just ain't right. . . . And I can't even do the things for my family that I should be able to.  It ain't right.  I'm sorry.

*Id.* at 1069 (emphasis added).

Those feelings of helplessness, hopelessness, limitation, and loss have now become an insoluble part of Ms. Prager's life as well.  She described to the jury her sadness, anger, and frustration at her husband's physical and emotional condition—a situation not readily expected to improve.  The jury heard that Ms. Prager now takes

28

medication for depression and that she and her husband no longer go to bed together. The jurors took in all of this testimony and weighed it as they saw fit.

The jury holds "the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000) (quotation omitted). "It is a fundamental legal principle that the determination of the quantum of damages in civil cases is a fact-finder's function." *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985). The jury, "who has the first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages, pursuant to the court's instructions, deemed proper to fairly compensate the injured party." *Id.* Further, "the amount of damages awarded by a jury can be supported by any competent evidence tending to sustain it." *Id.*

We think the jury acted within the reasonable bounds of its "wide latitude and discretion." *Id.* The jury was presented with—and duly weighed—a large amount of conflicting evidence. Inherent in its decision was a searching assessment of each witness's credibility. The court's instructions asked the jurors to draw from their "knowledge, observation and experience in life" in fixing an award for loss of consortium. Aplee. Supp. App. at 1648. We cannot reasonably say that the jury's award was so excessive that it shocks the judicial conscience.

We find the facts of this case strikingly similar to those of *Dolenz v. United States*, 443 F.3d 1320 (10th Cir. 2006). The plaintiff husband, Mr. Dolenz, was seriously hurt in

29

an automobile accident.  *Id.* at 1321.  His injuries included fractured vertebrae, head trauma, and various psychological aftereffects.  *Id.*  After a bench trial, the district court awarded damages for pain and suffering to Mr. Dolenz and also awarded two million dollars to Ms. Dolenz for her loss of consortium.  Since her husband's accident, Ms. Dolenz had "experience[d] feelings of stress, unhappiness, helplessness, and emotional exhaustion as a result of her husband's injuries."  *Id.* at 1323.  We affirmed both awards on appeal.  Reviewing the loss-of-consortium award to Ms. Dolenz, we held that "[t]here was sufficient evidence presented to the district court of the emotional distress suffered by Mrs. Dolenz as a result of her husband's injuries and of the strain placed on their relationship to support the award for loss of consortium."  *Id.*

In light of this court's similar firm pronouncement on similar facts in *Dolenz*, we feel compelled to reinstate the verdict for Ms. Prager.  The sad and lonely years ahead for Ms. Prager call for relief instead of rejection.  Both the emotional and physical drains that she will experience in the coming years amply warrant such relief.  The jury's determination should not have been disturbed.  Accordingly, we uphold the verdict of the jury in full.

**III. CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment in favor of Mr. Prager and REVERSE the remittitur of Ms. Prager's damages, with instructions to the district court to reinstate the full amount of the jury's award.