Amber Nicole LOMPE, Plaintiff,

v.

SUNRIDGE PARTNERS, LLC, and Apartment Management Consultants, LLC, Defendants.

Case No. 12–CV–88–J.

United States District Court, D. Wyoming.

Signed Oct. 21, 2014.

---

1254

George Bryan Ulmer, III, Tyson Logan, The Spence Law Firm, Jackson, WY, for Plaintiff.

Amy F. Sorenson, Snell & Wilmer, Salt Lake City, UT, Max K. Jones, Peter S. Dusbabek, Sara K. Stieben, Montgomery Kolodny Amatuzio & Dusbabek LLP, Fort Collins, CO, Patrick J. Murphy, Scott P. Klosterman, Williams Porter Day & Neville, Casper, WY, for Defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL OR REMITTITUR

ALAN B. JOHNSON, District Judge.

The defendants' renewed motion for judgment as a matter of law, or in the alternative, motion for new trial or remittitur (Doc. No. 175), and the plaintiffs response in opposition (Doc. No. 193) came before the Court for hearing on May 23, 2014. The Court, having reviewed the parties' submissions and all materials in the record, having considered counsel's arguments at the hearing, the applicable law, and being fully advised, hereby FINDS and ORDERS as follows:

### Background and Contentions

This was a personal injury action arising out of an event in which plaintiff Amber Lompe ("Lompe") suffered carbon monoxide poisoning in her apartment, which was owned and run by the defendants. The case was tried to a jury over a period of several weeks. On December 19, 2014, the jury entered its verdict in favor of plaintiff Lompe. The jury found defendant Sunridge Partners, LLC (Sunridge) to be 25% at fault, defendant Apartment Management Consultants, LLC (AMC) to be 65% at fault, and plaintiff Lompe to be 10% at fault. It went on to find that Lompe was entitled to recover damages in the amount of $3,000,000.00. The jury's verdict also included findings that the conduct of both Sunridge Partners, LLC and Apartment Management Consultants, LLC constituted willful and wanton misconduct, such that punitive damages should be awarded against each defendant.

The second phase of the trial addressed punitive damages. After hearing evidence and argument, and being instructed on the law, the jury found that punitive damages should be awarded. They found $3,000,000.00 punitive damages should be assessed against Sunridge and that $22,500,000.00 should be assessed against AMC.

In this motion, the defendants collectively argue this "unprecedented" verdict was the "culmination of a series of errors and omissions by the Court as to jury instructions and evidentiary rulings, the sole cure for which is the grant of a new trial pursuant to Fed.R.Civ.P. 59." They challenge the plaintiff's evidence and argue that punitive damages should have never been submitted to the jury. The verdict is characterized as a runaway verdict.

The following is a brief summary of the defendants' claims. They contend that, as to liability, the jury instructions given to the jury improperly increased their duty of care under Wyoming law, and simultaneously reduced or eliminated plaintiff's duties entirely. They claim the jury should have been instructed that a landlord must have notice of a defect before liability could attach and no such notice

was provided to the defendants of the blocked flue vent that resulted in the carbon monoxide incident in this case. They claim the jury should have been instructed as to intervening cause and that the landowner may assign its duties under the Wyoming Residential Property Act (WRPA). They contend that the plaintiffs actions, as they characterize them, in choosing to disable the carbon monoxide detector was not just comparative fault, but an assumption of risk, which led to an insufficient allocation of fault to plaintiff. They further argue that the Court instructed as to spoliation without making the required findings. The defendants assert various evidentiary errors stacked the deck against them. The jury did not hear that plaintiff had agreed to limit defendants' liability in the lease and that she failed to maintain the detectors in her apartment, and that had she done so, she would have prevented her own injuries.

As to punitive damages, defendants argue the evidence was insufficient, in that more than mere mistake, thoughtlessness, inadvertence, inattention or gross negligence is required. The instructions on punitive damages were not adequate in the defendants' view, where, defendants contend, they acted reasonably in hiring an experienced property manager, serviced furnaces as needed by hiring an HVAC professional, provided tenants with carbon monoxide detectors, broke no law, and violated no industry custom. The punitive damages award was grossly excessive and arbitrary and violated the due process clause of the Fourteenth Amendment.

It comes as no surprise that plaintiff disagrees entirely with the defendants' assertions and arguments. Plaintiff contends the instructions accurately stated defendants' duty of care, not increasing the duty, but defining the duty. It is an accurate statement of Wyoming law. The defendants' efforts to rely on common law landlord duties and immunities by asking for a "knew or should have known of the danger" standard is contrary to Wyoming law. The Wyoming Supreme Court held in *Merrill v. Jansma*, 86 P.3d 270, 287 (Wyo.2004), that the WRPA abrogated common law and "establishe[d] a new standard of conduct in cases involving personal injuries occurring on rental property—a standard of reasonable care under the circumstances." *Id.* Plaintiff argues that none of the instructions rendered defendants insurers of tenant safety. In sum, the instructions taken as a whole were correct and gave proper guidance to the jury.

Plaintiff asserts the instructions properly defined the plaintiff's duty of care, that no notice of defect instruction was appropriate, that no intervening cause instruction was necessary or appropriate, that Sunridge did not assign its duties under Wyoming law, and an assumption of risk instruction was unnecessary. The failure to produce evidence instruction was appropriate, fair, proper, not a sanction and applied equally to both sides. The instruction was not a spoliation sanction. The defendants cannot show prejudice as they requested an adverse inference instruction and ultimately, may have benefitted from the instruction given.

Plaintiff asserts no errors in evidence require a new trial. The Court did not err by redacting the "limited liability" clause of the lease; the redaction omitted confusing and improper portions of the lease that would have created jury confusion. Further, the plaintiff asserts that the prohibition of lease term interpretation and argument by counsel was appropriate, in that paragraph 28 of the lease relating to smoke detectors had no bearing in the case.

The opinion claiming to establish a local standard of care was properly excluded. The Court properly prohibited expert opinion from Peter Meer from testifying about a locality standard of care when that matter has been addressed by statute. Post-incident evidence that the carbon monoxide alarm provided in her apartment when she moved out was broken was offered to rebut the argument that Lompe was negligent or that she was ever provided a functioning carbon monoxide alarm. Plaintiff contends evidence, including semi-annual inspection reports, disclosed missing carbon monoxide alarms in many units, and that weeks after Lompe was poisoned, the majority of apartments did not have functioning alarms, nothing had changed, and the defendants did not have a practice in place to provide functioning alarms or carbon monoxide detectors to tenants. These were not remedial measures precluded from being admitted into evidence by Fed.R.Evid. 407.

After Mike Few, the on-site manager was poisoned by carbon monoxide, a SourceGas employee told AMC employee Mesenbrink that it should have its furnaces inspected. The defendants objected to this evidence as hearsay; plaintiffs clarified it was being offered to prove that defendants had notice the furnaces needed to be inspected, not that they actually needed to be inspected. The statement was initially excluded, but later allowed through Lompe's safety expert, Slifka. The statement was not offered to prove the truth of the matter asserted and was proper.

Plaintiff's experts testified in accordance with their qualifications and designations, including Dr. Weaver, who testified regarding his clinical interpretations of MRI and fMRI imaging, information he relied on when evaluating Lompe. Likewise, he also relied on data compiled by others, including Dr. Orrison, who performed the MRI and fMRIs of Lompe. Orrison's statements to Weaver were indeed hearsay, but admissible because their probative value in aiding the jury to understand Weaver's opinion was substantially outweighed any prejudicial effect. Fed. R.Evid. 703. The plaintiff argues the Court did not abuse its discretion by allowing testimony outside the scope of the experts' Rule 26 designations, including the testimony of Drs. Holmberg, Foley, and Helffenstein and economist Randle.

As to punitive damages, plaintiff argues the matter was properly submitted to the jury and there was a sufficient evidentiary basis from which it could find the defendants acted willfully and wantonly, in accordance with Wyoming law. Before denying the defendants' renewed motion for a directed verdict on punitive damages, the Court considered all the evidence and found it should be a question for the jury to decide. Instructions given on punitive damages accurately stated the law; there was no violation of due process rights by allowing the defendants' financial conditions to be considered. Plaintiff characterizes the defendants' conduct as reprehensible and especially egregious, justifying consideration of the punitive damages and amount of any award by the jury.

### Judgment as a Matter of Law

The Tenth Circuit outlined the applicable standard for granting a judgment as a matter of law in *Jones v. United Parcel Service, Inc.,* 674 F.3d 1187, 1195 (10th Cir.2012):

We review de novo the district court's denial of a motion for judgment as a matter of law. *Cummings v. Gen. Motors Corp.,* 365 F.3d 944, 949 (10th Cir. 2004). In diversity cases, "the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable stan-

dards of proof, but federal law controls the ultimate, procedural question whether [judgment as a matter of law] is appropriate." *Wagner v. Live Nation Motor Sports, Inc.,* 586 F.3d 1237, 1244 (10th Cir.2009) (internal quotation marks omitted). Under federal law, "[a] party is entitled to judgment as a matter of law only if all of the evidence, viewed in the light most favorable to the non-moving party, reveals no legally sufficient evidentiary basis to find for the nonmoving party." *Burrell v. Armijo,* 603 F.3d 825, 832 (10th Cir.2010). Judgment as a matter of law "is warranted only if the evidence points but one way and is susceptible to no reasonable inferences to support the party opposing the motion." *Baty v. Willamette Indus., Inc.,* 172 F.3d 1232, 1241 (10th Cir.1999) (citation and quotation omitted).

See also *Spahr v. Ferber Resorts, LLC,* 419 Fed.Appx. 796, 800 (10th Cir.2011).

The Court is not persuaded by the defendants' arguments that the instructions given to the jury were not in accordance with governing Wyoming law.

Instruction No. 19 stated:

Because the amount of care exercised by a reasonably prudent person varies in proportion to the danger known to be involved in what is being done, the amount of caution required in the use of ordinary care varies with the nature of what is being done and all the surrounding circumstances shown by the evidence in the case. To put it another way, any increase in foreseeable danger requires increased care.

 This instruction is consistent with Wyoming law, as stated by the Wyoming Court in *Wyrulec Co. v. Schutt,* 866 P.2d 756, 762 (Wyo.1993):

However, we believe the standard is correctly stated as ordinary or reason-

able care but what constitutes ordinary care increases as the danger increases. The concept of ordinary care accommodates all circumstances so that the degree of care varies with the circumstances. Ordinary care which is "commensurate with the danger" does not impose a higher duty, "but more fully defines what is ordinary care under the facts presented." *Texas Utilities Elec. v. Gold Kist,* 817 S.W.2d 749, 753 (Tex.App.1991). See also, *Rich Mountain Elec. Co-op., Inc. v. Revels,* 311 Ark. 1, 841 S.W.2d 151, 153 (1992) (electric companies must exercise ordinary care); and *Rogers v. Grunden,* 589 N.E.2d 248, 256 (Ind.App.1992) (although some states require utmost care, we require ordinary care under like conditions and circumstances).

Defendants tendered Instruction No. 7, No. 8, No. 9, and No. 10. These instructions were rejected with the Court finding them to be redundant. The proposed instructions added little to Instruction No. 19 advising the jury of the standard of care.

The Wyoming Supreme Court discussed the standard of care established when the Wyoming Residential Property Act, Wyo. Stat. § 1–21–1201 *et seq.,* was enacted by the legislature. In *Merrill v. Jansma,* 86 P.3d 270, 287 (Wyo.2004), it stated:

We further hold that this legislatively created duty establishes a new standard of conduct for purposes of personal injuries occurring on rental property. As we said in *McClellan v. Tottenhoff,* 666 P.2d 408, 413 (Wyo.1983), the duty of exercising care to protect another person may exist either at common law or be imposed by statute, and where legislation is silent as to whether it establishes a new standard of conduct for purposes of a tort action, it is up to the judiciary to decide whether it has that

effect. Here, the statute imposed the duty, and we conclude that it likewise establishes a new standard of conduct in cases involving personal injuries occurring on rental property—a standard of reasonable care under all of the circumstances. In reaching this conclusion, we act to further the legislature's intent. Our holding is also influenced by the following comment:

> If one can extricate himself from all the prevailing preconceptions concerning the nature of this problem, the most simple and obvious avenue to defining a landlord's tort liability respecting the condition of leased premises is to brush aside contracts, warranty, or statutory violations, and declare a rule of reasonable care, which includes the duty to respond reasonably to the need for action and to act reasonably in doing so.... In most states having new statutes that impose a similar general obligation on landlords, courts by construction could ... treat the statutes as enlarging a landlord's duty....

*Browder,* supra, at 124.

In concluding that the act does away with the common law rule and its exceptions and imposes a duty of reasonable care under the circumstances, we also point to the rule that we are to presume the legislature enacts statutes with full knowledge of existing law. *Parker [Land and Cattle Co. v. Wyoming Game and Fish Com'n],* 845 P.2d [1040] at 1044 [ (Wyo.1993) ]. We do not review statutes in isolation but rather construe them in relation to and in harmony with existing law and as part of a general and uniform system of jurisprudence. *Id.* Our legislature enacted the Residential Rental Property Act at a time when landlord-tenant law was undergoing massive changes nationwide. Numerous states had already enacted the URLTA. The vast majority of other states, either by legislation or by judicial decision, had adopted similar rules of law imposing a duty on landlords. We had expressly deferred similar action to our state legislature. Accordingly, we presume the legislature enacted the Residential Rental Property Act with full knowledge of the law in Wyoming that, with only limited exceptions, a landlord historically had no duty to maintain rental premises. We also presume the legislature enacted the provision with full knowledge that the trend nationwide has been to replace the no-duty rule and impose a duty on landlords to keep rental property safe. We further presume the legislature promulgated the act with full knowledge that this Court declined to judicially change the common law rule on several occasions because in our view it was a matter for the legislature. Making these presumptions, and looking at the plain language used by the legislature, we do not find the act to be vague or uncertain or subject to varying interpretations. In providing that the owner of rental property and his agent have a duty to "maintain that unit in a safe and sanitary condition fit for human habitation," the legislature has spoken in unambiguous terms and we are bound to the results so expressed. [*Skaggs-]Albertson's,* ¶ 7....

Here, the defendants' argument suggests the instructions attempt to define or broaden the standard of care and limit the jury's consideration of all evidence at trial in making its decision. The defendants' proposed instructions are objectionable in that they are not accurate statements of law, they are argumentative, and add little to the instructions actually given. Nothing precluded the defendants from making arguments during their closing arguments to persuade the jury that they did everything

required by the WRPA with respect to inspection, maintenance, and repair of the rental property. Instruction No. 19 instructed the jury regarding the standard of care and noted that standard varied with the nature of what is being done and the circumstances shown by the evidence in the case. The jury also was instructed on applicable statutory language in Instruction No. 27, No. 28, No. 29, and No. 30.

At trial, the Court refused defendants' proposed intervening cause instructions, No. 3 and No. 4. The instructions given, No. 19A, No. 20, No. 21, and No. 34 provided guidance to the jury regarding cause. Furthermore, the Court's instruction on comparative negligence addressed these concerns, and required the jury to allocate fault for acts or omissions determined to be a cause of the injury. Fault includes and embraces, among other things, assumption of risk by a party. The recovery of damages is limited in accordance with the comparative fault statute. See e.g., Wyo. Stat. § 1–1–109. The jury considered all evidence during trial that was or was not presented and made its liability determinations for each of the parties in accordance with the evidence presented at trial and the Court's instructions. Defendants' Instruction No. 14 was refused for these same reasons.

■ Defendants' proposed Instruction No. 5 included a paragraph providing, "[a]ny duty or obligation in this article may be assigned to a different party or modified by explicit written agreement signed by the parties." Wyo. Stat. § 1–21–1202 addresses the duties of owners and renters:

(a) Each owner and his agent renting or leasing a residential rental unit shall maintain that unit in a safe and sanitary condition fit for human habitation. Each residential rental unit shall have operational electrical, heating and plumbing, with hot and cold running water unless otherwise agreed upon in writing by both parties. Provided, however, this section shall not prevent the rental of seasonal rental units such as summer cabins which are not intended to have such amenities.

(b) Each renter shall cooperate in maintaining his residential rental unit in accordance with this article.

(c) This article does not apply to breakage, malfunctions or other conditions which do not materially affect the physical health or safety of the ordinary renter.

(d) Any duty or obligation in this article may be assigned to a different party or modified by explicit written agreement signed by the parties.

The statute applies to assignments between landlords and tenants. It does not govern any assignment between landlords and property managers. An extensive and thoughtful analysis regarding shifting of responsibilities is included in an article written by Arthur R. Gaudio, *Wyoming's Residential Rental Property Act—A Critical Review,* 35 Land & Water L. Rev. 455, 478 (2000). The author there stated:

The more general of the two provisions in the Act allowing for a waiver of landlord's duties provides that "[a]ny duty or obligation in this article may be assigned to a different party or modified by explicit written agreement signed by the parties." [FN111] How should the word "explicit" be interpreted? Does "explicit" simply mean "written?" If so, all that the lease agreement would need to contain is a written provision stating that the warranty was waived. For example, a simple boilerplate provision stating that the tenant takes the premises "as is" or that the "tenant hereby waives all warranties" can negate the

warranty. However, that interpretation seems doubtful and inappropriate for several reasons.

First, if the word "explicit" merely meant "written," there would have been no need for the legislature to state that the waiver must be "explicit." The provision already states that the waiver must be written. All the provision would mean is the waiver must be by "written agreement." Obviously, that was not intended. Therefore, the word "explicit" must mean something more demanding.

Second, the language of the section gives some idea of what the legislature was intending. Not only does the provision deal with modification of the landlord's duties, but also deals with assigning them to a different party. The only other party to whom the landlord's duties could be assigned is the tenant. This brings to mind situations in which the tenant, in consideration for a reduction in rent or some other benefit, is willing to accept that obligation and waive his rights under the Act. To be fair to basic contract concepts, however, that assignment should not be presumed unless the tenant knowingly accepts the assignment. As if to emphasize that fact, the provision requires the assignment or modification be made by "explicit" language. Any failure of the lease explicitly to identify the obligation being modified or assigned is not in compliance. Thus, any language of general disclaimer, acceptance of the premises "as is," or language that does not draw the attention of the tenant to the "explicit" defect involved is insufficient to meet the requirements of the statute.

Justice Thomas, of the Wyoming Supreme Court, dissenting in a recent case, called attention to the same issue regarding a tort disclaimer in a real estate contract:

As a matter of public policy, disclaimers in contracts will not be honored unless the disclaimer is specific with respect to the tort disclaimed, and it is apparent that an express bargain was stuck to forgo the possibility of tort recovery in exchange for negotiated alternative economic damages.... The waiver of tort liability by the purchaser in such a contract is permitted, but only with knowledge and if bargained for in the exchange. [FN112]

Finally, given the fact that the legislature went to the effort of adopting an implied warranty, why would it allow a landlord to negate it so easily? Since we now have a statute imposing an implied warranty on the landlord, we no longer have a "bare table" on which there are no presumptions. [FN113] There is now a presumption of an implied warranty. A waiver should be permitted only if the policy reasons for adopting the warranty in the first place have not occurred in the particular landlord tenant situation.

Perhaps the most significant policy reason for treating residential leases differently than other leases and implying a warranty is that residential tenants usually are not in an equal bargaining position with their landlord and the implied warranty tends to even out the bargaining field. Thus, it would be appropriate to inquire whether the landlord and tenant were in a position of actual even-handed negotiations over the exclusion of the warranty. Was the tenant aware of the defect for which the landlord is disclaiming responsibility? Does the wording of the waiver draw the attention of the tenant to a specific defect, or is the defect a latent one? Was there consideration for the waiver? If the response to these questions is in the

negative, it seems inappropriate to allow the landlord to disclaim his statutorily imposed duties.

This approach supports the basic purposes behind the adoption of the implied warranty. If landlords must disclose the precise defect that is being waived, the stock of habitable housing in the state will be enhanced. [FN114] If they have the choice, tenants will generally choose not to rent a defective apartment. Explicit disclosure should encourage the landlord to make the repair and, as a result, will improve the stock of habitable housing. In other words, the economics of the marketplace should encourage the maintenance and improvement to the stock of habitable dwellings in the state.

The other provision regarding waivers is less clear regarding the need for specific language. It provides that "[e]ach residential unit shall have electrical, heating and plumbing, with hot and cold running water unless otherwise agreed upon in writing by both parties." [FN115]

The sentence begins by requiring certain amenities but allows one or more of them to be waived by an agreement in writing. Nevertheless, it does not allow a general waiver of the warranty itself; it only allows the waiver of specific amenities, if agreed to in writing. To be in compliance with the requirements of this section, the lease agreement must at least mention that the disclaimer involves electrical, heating, plumbing and/or hot and cold running water. If it purports to affect more than those specific amenities, it attempts to do more than the Act allows. Furthermore, this section does not allow general disclaimers or "as is" clauses. An "as is" clause affects, or potentially affects, more than the listed amenities.

Unlike the previously discussed provision, this section would appear to allow waiver of the listed types of amenities without specifying the explicit defect involved. For example, although this provision does not allow a waiver of all warranties, it may allow a waiver of "all warranties concerning heating of the leased premises." That disclaimer is not as explicit as is required by the prior provision. As so interpreted, it would allow landlords to insert boilerplate disclaimers mentioning the listed amenities. Landlords would be able to obviate most of the significant provisions of the Act simply by including such boilerplate disclaimers.

It is also interesting to note that such a loose interpretation of this provision would allow a disclaimer of the most central habitability elements by general language, while other habitability issues [FN116] which may not be so central, would need the explicit language required by the more general provision. [FN117] The courts could avoid this incongruity. They could interpret the requirements of the more demanding provision as controlling, since it is more specific.

Some examination of lease language as interpreted under both of these provisions might be helpful. Consider the following examples:

(1) "The tenant accepts the premises as is" or "the tenant waives all implied warranties as created by law." This language is not sufficiently specific to qualify for an explicit disclaimer, nor does it mention the specific amenities and, thus, does not qualify for the more general disclaimer. Furthermore, in neither case is the tenant's attention drawn to the defect involved. If the defect currently exists and is known to the landlord, he should not be allowed to

absolve himself by failing to disclosing the defect. He would be laying a trap for a legally unsophisticated tenant.

(2) "The tenant waives all implied warranties to provide heat to the premises." In this case, there is a mention of the specific type of amenity being disclaimed and it is one of those listed in the statute, but there is no indication that the tenant was advised as to an "explicit" defect and allowed to evaluate it. [FN118] Nor is there any indication that the tenant was given any consideration for the waiver. [FN119] This example does not qualify under the provision requiring explicit language in the waiver. However, it might qualify under the more general provision since it does mention the specific type of amenity being disclaimed.

(3) "The tenant hereby recognizes that the furnace in the house does not operate and in consideration for a reduction in the rent agrees to fix the furnace and supply her own heat." This reassignment of duties is explicit. It mentions not only the fact that it involves heat, but also clearly identifies the explicit defect. The tenant is given information that she can evaluate and upon which she can make a decision. She is also given consideration for accepting the assignment of the duties that would otherwise be placed on the landlord; thus, it qualifies under either provision.

(Footnotes omitted.)

This is a persuasive analysis and the Court finds that the language relied upon by the defendants' to shift the responsibility one to the other has no application here and even if it did, the lease did not include an explicit written waiver or assignment signed by Amber Lompe.

Instruction 47a given by the Court provided:

If a party fails to produce evidence under that party's control and reasonably available to that party and not reasonably available to the adverse party, then you may infer that the evidence is unfavorable to the party who could have produced it and did not.

This is instruction 104:26 in the pattern O'Malley, Grenig, and Lee Federal Practice and Instructions (Sixth Edition). The notes in O'Malley indicate that no inference can be drawn from the failure to produce evidence not in a party's control, citing *Savard v. Marine Contracting Inc.,* 471 F.2d, 536, 541–542 (2d Cir.1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2778, 37 L.Ed.2d 404 (1973).

However, Instruction 47a was given in conjunction with Instruction No. 47:

In considering the evidence, you are permitted to draw such reasonable inferences as seem justified in light of your experience. Inferences are deductions or conclusions which reason and common sense lead the jury to draw from facts established by the evidence. Any findings of fact you make, however, must be based on probabilities—not possibilities. A finding of fact may not be based on surmise, speculation, guesswork or conjecture.

In another case, the Second Circuit determined that a missing evidence instruction in an employment case permitting the jury to draw reasonable inferences from missing evidence in favor of either parties' positions was not fundamental error, where the missing evidence was repeatedly referred to at trial, and the support it may have lent to the discrimination claims was speculative. The court stated:

Undertaking that review, we conclude that even assuming Lewis was entitled to an adverse inference instruction based on CBP's failure to locate and introduce certain evidence at trial, the

magistrate judge's charge was not so fundamentally flawed as to "deprive[ ] the jury of adequate legal guidance to reach a rational decision." *Id.* Rather, given Lewis's repeated reference to the missing evidence at trial and the speculative nature of the support it may have lent to his discrimination claims, the charge as given provided adequate guidance by permitting, but not requiring, the jury to draw reasonable inferences from the missing evidence in favor of either Lewis's or CBP's positions. Furthermore, the magistrate judge informed the jury that in determining "whether to draw any inferences, [it] should consider whether the evidence that was not produced would merely have been duplicative of other evidence" already in the record and whether the admitted evidence supports or refutes the inferences the jury is being asked to draw. In light of the circumstances of this case, we hold that the magistrate judge's missing evidence instruction did not constitute fundamental error; the instruction instead provided reasonable guidance to the jury as it worked to reach a verdict and make sense of testimony and arguments about documents not admitted as evidence at trial.

*Lewis v. Napolitano,* 423 Fed.Appx. 43, 46 (2d Cir.2011).

Defendants characterize Instruction 47a as punitive; plaintiff disagrees and then continues to offer a recitation of facts demonstrating bad faith that would support an explicit spoliation instruction. The given instruction applied to all parties. The instruction permitted the jury to consider all evidence and draw its own conclusions in reaching its verdict. Compare to this the more specific permissive adverse inference instruction given and upheld in *Mali v. Federal Ins. Co.,* 720 F.3d 387, 391 (2d Cir.2013):

In this case, evidence has been received which the Defendant contends shows that a photograph exists or existed of the upstairs of what had been referred to as the barn house, but no such photograph has been produced. If you find that the Defendant has proven by a preponderance of the evidence, one, that this photograph exists or existed, two, that the photograph was in the exclusive possession of the Plaintiffs, and, three, that the non-production of the photograph has not been satisfactorily explained, then you may infer, though you are not required to do so, that if the photograph had been produced in court, it would have been unfavorable to the Plaintiffs. You may give any such inference, whatever force or effect as you think is appropriate under all the facts and circumstances.

Defendants here cite *Henning v. Union Pacific Railroad Co.,* 530 F.3d 1206 (10th Cir.2008) to argue Instruction 47a was improper and that a showing a bad faith was required before any adverse instruction could be given. *Henning* is distinguishable on its facts. However, the Tenth Circuit did state an adverse inference

... is a powerful sanction as it "brands one party as a bad actor" and "necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information in the unknown contents of an erased audiotape." *Morris v. Union Pac. R.R.,* 373 F.3d 896, 900–01 (8th Cir.2004). Therefore, courts require evidence of intentional destruction or bad faith before a litigant is entitled to a spoliation instruction. *Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1407 (10th Cir.1997)." 530 F.3d at 1219–1220.

The plaintiff there argued that a spoliation instruction was appropriate where au-

dio tapes had been destroyed pursuant to company policy. UPRR had sent immediately an audio tape it had thought to be the correct recording of the accident, but learned later the correct audio tape had been destroyed. The plaintiff had provided no evidence showing the audio tapes contained any relevant evidence supporting the contention that new trial should have been granted. Plaintiff had also failed to demonstrate prejudice. The court noted that relevance is a highly fact-specific inquiry and that information in one case may be relevant but not in another and the court has the discretion to fashion an appropriate remedy depending on the culpability of the responsibility party and whether the evidence was relevant to proof of an issue at trial.

Here, the evidence was relevant. The apartment manager, Few, took photographs of the apartment after Lompe was poisoned; photographs were never produced. Few had changed documents, filled out various versions of incident reports with different dates and recitals, and other information had been altered or omitted on documents related to Lompe's apartment. This evidence was testified to by Few at trial. This is not a case of mere theoretical prejudice to plaintiff caused by evidence that defendants did not produce. This evidence was relevant. In the Court's view, the failure to produce instruction, applicable to all parties, was appropriate in this case.

 As to the various evidentiary errors defendants complain about, the Court finds they do not warrant a new trial. The Court has already addressed the defendants' arguments regarding assignment of duties in the preceding portions of this Order and further discussion will not be offered. As to the exclusions of paragraph 28 of the lease, this section addresses smoke detectors and does not address car-

bon monoxide detectors. It is not relevant. Redaction of the exculpatory clause, if erroneous, was at most harmless error, when coupled with the jury's finding of willful and wanton conduct, a standard greater than that included in the exculpatory clause. Exculpatory clauses in residential leases have been found void as contrary to public policy. See e.g., *Stanley v. Creighton Co.*, 911 P.2d 705, 709 (Colo.App.1996) (relying on provisions of the Colorado Premises Liability Act, Colo. Rev.Stat. § 13–21–115, stating the act "confirms that landowner negligence is an issue of public concern.")

As Professor Gaudio stated, residential leases have been more or less an orphan child in the Wyoming legal structure, perhaps with understandable social and economic reason. Arthur R. Gaudio, Wyoming's Residential Property Act—A Critical Review, 35 Land & Water L. Rev. 455–456. The act addresses pressing issues presented by residential leases and a body of law devoid of tenant protections. *Id.* Public policy, as encompassed in the Wyoming Residential Property Act, is to provide a modicum of protection to residential lessees and identify specific statutory obligations that a landowner and his agent must satisfy and similarly, concerns landowner responsibilities as owed to renters and members of the public, and conversely, responsibilities of the tenant to the landowner and agent. *Merrill v. Jansma*, 86 P.3d 270 (Wyo.2004) also recognized that the Wyoming Residential Property Act, and the Uniform Residential Landlord Tenant Act, replace the common law providing for landlord immunity and supplanting common law with clearly established statutory duties owed by the landlord to a tenant.

Defendants complain about the exclusion of Peter Meer. The Court persists in its

prior determination excluding his testimony describing, interpreting or attempting to give legal opinions regarding the meaning of a contract. While he was not permitted to testify about a "locality" standard of care which has been addressed by statute, the Court's ruling permitted him to testify about the differences between the roles of a property manager and a property owner.

■ Defendants' criticism of the Court's decision allowing admission of property inspection reports is not well taken. The reports were allowed into evidence in order to demonstrate condition of the property at the time of the accident and to demonstrate a lack of contributory negligence. Use of the reports was permitted to impeach defense witnesses pursuant to Fed.R.Evid. 407. Post-accident reports were not remedial measures prohibited by Fed.R.Evid. 407.

■ Expert Slifka was permitted to testify regarding statements made by a Source Gas employee to AMC's employee Mesenbrink. The statement was offered to prove notice, rather than the truth of the matter asserted, and thus, not hearsay. A great deal of testimony during trial demonstrated the defendants were on notice of outdated furnaces in the complex that needed inspection, maintenance, repair or replacement.

■ Publication of images regarding MRI and fMRI images of Lompe's brain provided to Dr. Weaver by Dr. Orrison were not statements, were not hearsay, and were relevant evidence. Dr. Weaver testified that clinicians rely on the type of data provided by specialists like Dr. Orrison when seeking to evaluate a particular patient. The MRI and fMRI images were this type of data; they were independently interpreted by Dr. Weaver; the images were helpful to the jury in understanding Dr. Weaver's testimony and opinions.

■ Defendants were not prejudiced by testimony of the plaintiff's experts, including Drs. Holmberg, Foley, and Helffenstein, beyond the scope of Rule 26 disclosures, about the reasonableness and necessity of medical bills and care. There has not been a sufficient showing by defendants how they were prejudiced nor does the Court discern prejudice to the defendants, as the same evidence, even if it had been precluded, could have been offered by treating physicians. Furthermore, the defendants listed these physicians and did not call them.

■ As to the economist Randle who provided summaries of the defendants' financial data, there could be no prejudice to defendants as it was their own information, even if it was in summary form. They have not demonstrated prejudice by presentation of a summary rather than a full presentation of the raw underlying financial data, which had not been provided to plaintiffs until immediately before trial. The summaries were disclosed during trial and the defendants had an ample opportunity to pursue the issue through cross-examination and through presentation of their own defense.

■ Defendants complain that the punitive damages issue should not have been permitted to go to the jury ands that the jury was improperly instructed. The instruction given to the jury was an accurate instruction based on the Wyoming Civil Pattern Jury Instructions. The definition of wilful and wanton misconduct, although the defendants' main complaint seems to be that it was too short and simple, was an accurate statement of Wyoming law, as discussed in *Weaver v. Mitchell,* 715 P.2d 1361, 1370 (Wyo.1986):

Although degrees of negligence are not considered in comparative negligence, it must be remembered that the traditional concept of gross negligence visualized less culpable conduct than willful and wanton conduct. Gross negligence has been defined as:

"* * * Indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons maybe be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. But it is something less than the willful, wanton and reckless conduct. * * *" *Altman v. Aronson*, 231 Mass. 588, 121 N.E. 505, 506, 4 A.L.R. 1185 (1919).

Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another. *Danculovich v. Brown*, supra[, 593 P.2d 187 (Wyo. 1979)].

See also *Cramer v. Powder River Coal, LLC*, 204 P.3d 974, 978 (Wyo.2009).

The evidence in this case was sufficient to allow this matter to be considered by the jury following instruction according to Wyoming law. The jury's synthesis of all the testimony, evidence and exhibits received during the trial is not something readily capable of review. What weight they attributed to a witness's testimony, how they assessed credibility of witnesses, and their consideration of exhibits admitted is not something the Court or the parties can divine on the record of these proceedings. It was the jury's task to decide, based upon the evidence at trial, whether the defendants' conduct was willful and wanton. They did make such a finding, as reflected on the verdict form in the first phase of the trial. Once that finding had been made by the jury, the second phase allowed the jury to determine the amount of punitive damages to be awarded, following the instruction given by the Court providing guidelines for their decision. The instruction given was consistent with Wyoming Civil Pattern Jury Instruction 4.06A.

Punitive damages serve a broader function than that served by an award of compensatory damages. They are aimed at deterrence and retribution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003). The Supreme Court has instructed courts reviewing punitive damages:

... to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.*, at 575, 116 S.Ct. 1589. We reiterated the importance of these three guideposts in *Cooper Industries[, Inc. v. Leatherman Tool Group, Inc.]* and mandated appellate courts to conduct de novo review of a trial court's application of them to the jury's award. 532 U.S. 424, 121 S.Ct. 1678[, 149 L.Ed.2d 674 (2001) ]. Exacting appellate review ensures that an award of punitive damages

is based upon an "'application of law, rather than a decisionmaker's caprice.'" *Id.* at 436, 121 S.Ct. 1678 (quoting [*BMW of North America, Inc. v.*] *Gore,* supra [517 U.S. 559], at 587, 116 S.Ct. 1589[, 134 L.Ed.2d 809 (1996)] (BREYER, J., concurring)).

*Id.* at 1520. The Court continued:

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* at 576–577, 116 S.Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. *Id.* at 575, 116 S.Ct. 1589.

The Court finds that the evidence in this case does support a finding by the jury that punitive damages should be awarded. The jury could easily find the defendants' conduct reprehensible. The failure to address concerns with the furnaces, even in the face of prior carbon monoxide exposures to individuals other than Lompe, was a harm other than economic and the jury could properly determine the defendants' tortious conduct evinced an indifference to or reckless disregard of the health or safety of others. Plaintiff, and other tenants, did not possess equal bargaining power and could be viewed as financially vulnerable. This was not an isolated incident. The jury was instructed that the degree of reprehensibility of the defendant's conduct and the degree of the defendants' awareness of any hazard they caused or were likely to cause, concealment or coverup of the hazard, existence and frequency of similar past conduct were all relevant. They were instructed the harm that actually occurred should bear a reasonable relationship to the harm likely to occur from that conduct and the harm that actually occurred. They were instructed if the conduct was profitable to the defendant, punitive damages should remove the profit. The Court finds that the issue of punitive damages was properly submitted to the jury. They awarded plaintiff $3,000,000.00 compensatory damages; the punitive damage award as to defendant Sunridge Partners, LLC was $3,000,000.00; as to defendant Apartment Management Consultants, LLC, the punitive damages assessed by the jury were in the amount of $22,500,000.00. The amount of the punitive damages imposed in the case will be addressed in the next section of this order considering the defendants' request for a remittitur.

### Remittitur

In *Brown v. Skaggs–Albertson's Properties, Inc.,* 563 F.2d 983, 988 (10th Cir. 1977), the circuit court stated:

The remittitur procedure is a matter peculiarly within the discretion of the trial judge. *Walker v. Boulet,* 473 F.2d

1265 (9th Cir.1973); *Kennair v. Mississippi Shipping Co.*, 197 F.2d 605 (2d Cir.1952). For this court to order a remittitur at this eleventh hour in the proceedings would require a determination by us that the trial court had abused its discretion. In that connection, Oklahoma recognizes a broad jury discretion to determine the amount of damages for intangible injuries such as damage to reputation, humiliation, etc. The Oklahoma court has said that before a verdict of the jury will be set aside as excessive, it must appear that the verdict is so excessive as to "strike mankind, at first blush, as being beyond all measure unreasonable and outrageous and such as manifestly shows the jury to have been actuated by passion, partiality, prejudice or corruption." *Park v. Security Bank & Trust Co.*, 512 P.2d 113 (Okl.1973).

The Tenth Circuit Court has persisted in this analysis in *M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009):

> We review the district court's denial of Kerr–McGee's motion for remittitur or a new trial due to excessive damages under a highly deferential standard, reversing only if we can discern a "manifest abuse of discretion." *Vining v. Enter. Fin. Group, Inc.*, 148 F.3d 1206, 1216 (10th Cir.1998). Under this standard, the jury's award is inviolate unless we find it "so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *Id.*

See also *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir.1998) (" 'absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the fact is considered inviolate.' ")

Likewise, under Wyoming law, this type of analysis obtains. The Wyoming Supreme Court has articulated similar principles with respect to the granting of a remittitur in *Caterpillar Tractor Co. v. Donahue*, 674 P.2d 1276, 1289 (Wyo.1983):

> The final issue we address is whether we should grant a remittitur as a condition of an affirmance. In *Cates v. Eddy*, Wyo., 669 P.2d 912 (1983), we stated: "If the verdict is so large or small that it shocks the judicial conscience, the court has not only the right, but the duty, to grant remittitur or additur accordingly."

The Supreme Court has provided guidelines which should inform the decision here. *State Farm Mut. Auto. Ins. Co. v. Campbell* reiterated that the Court has consistently rejected bright line ratios between compensatory and punitive damages awards. 123 S.Ct. at 1524.

> Turning to the second *Gore* guidepost, we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. 517 U.S. at 582, 116 S.Ct. 1589 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award"); *TXO*, supra, at 458, 113 S.Ct. 2711. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip*, in upholding a punitive damages award, we concluded that an award of

more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S. at 23–24, 111 S.Ct. 1032. We cited that 4–to–1 ratio again in *Gore*, 517 U.S. at 581, 116 S.Ct. 1589. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. *Id.* at 581, and n. 33, 116 S.Ct. 1589. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *id.* at 582, 116 S.Ct. 1589, or, in this case, of 145 to 1.

Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Ibid.;* see also *ibid.* (positing that a higher ratio might be necessary where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine"). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered. In the context of this case, we have no doubt that there is a presumption against·an award that has a 145–to–1 ratio. The compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress. This was complete compensation. The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed, so the Campbells suffered only minor economic injuries for the 18–month period in which State Farm refused to resolve the claim against them. The compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element. See Restatement (Second) of Torts § 908, Comment c, p. 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both").

 The ratio here was 9–to–1 (considering the total punitive damages award for both defendants collectively). If the ratio is considered as to each defendant separately, for Sunridge Partners, LLC, it is 1–to–1. For Apartment Management Consultants, LLC, it is 7.5–to–1. This is within the realm of punitive damages that

does not cross the constitutional line. The Court is also reminded trial by jury is the bedrock of our legal system. *Prager v. Campbell County Memorial Hosp.*, 731 F.3d 1046, 1061 (10th Cir.2013). A court's authority to grant remittitur should be exercised with extreme reluctance to modify a jury verdict. *Id.* at 1061.

To be sure, a district court acts within its discretion in ordering a remittitur of damages that are so grossly excessive as to shock the judicial conscience. [FN8 omitted] But, after careful consideration, we do not think this is such a case. "We review the trial court's decision regarding remittitur for an allegedly excessive damages award for an abuse of discretion." *Palmer v. City of Monticello*, 31 F.3d 1499, 1508 (10th Cir.1994). A district court abuses its discretion in ordering a remittitur "when the size of the verdict turns upon conflicting evidence and the credibility of witnesses." *Id.* In a word, the jury's award is "inviolate." *Id.* And it remains inviolate "so long as it is not so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Id.* (quotations omitted); see also *M.D. Mark, Inc. v. Kerr— McGee Corp.*, 565 F.3d 753, 766 (10th Cir.2009) (same).

*Id.* at 1061–1062 (footnote omitted).

 In this case, the Court hesitates to interfere with the jury's determination as to punitive damages. The harm here was not mere economic harm or injury. The injury was physical; if the plaintiff had been in her apartment even minutes longer, she likely would have lost consciousness and the carbon monoxide exposure could have disabled her for the rest of her life or could have been fatal. The potential for similar injuries to others was great where the defendants failed to correct known problems with furnaces in the apartment complex, exposing other tenants to carbon monoxide poisoning as well. The evidence of defendants' wealth was proper, if the goals of punishment and deterrence are to be facilitated. A defendant may be punished for malfeasance and conduct similar to that which harmed plaintiff. This is the only conduct that is relevant to the reprehensibility analysis. *State Farm*, 123 S.Ct. at 1524.

The Court here acknowledges that the award of punitive damages is significant and far greater than that usually seen in this district. In all probability, the Court likely has not made such a large award for punitive damages. But, it is not the Court's province to second-guess the jury's findings where the award is within constitutional bounds and does not shock the judicial conscience. It is unquestioned that the jury viewed the defendants' conduct as egregious, warranting a greater award of punitive damages. While surprising, the award does not shock the judicial conscience nor is the Court compelled to conclude that the jury's award should be upset, based on the facts and circumstances of the defendants' conduct and the harm to the plaintiff and potential harm to others. There is no irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial. The Court will not belabor the matter further and will not grant the request for a remittitur or new trial.

Accordingly, it is hereby

**ORDERED** that the defendants' renewed motion for judgment as a matter of law, or in the alternative, motion for new trial or remittitur, shall be, and is, **DENIED.**