**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**February 25, 2016**

**FOR THE TENTH CIRCUIT**

_____

MICHAEL HILL, as Special Administrator
of the Estate of Jimmy Hill,

     Plaintiff - Appellee,

v.

J.B. HUNT TRANSPORT, INC.,

     Defendant – Appellant.

No. 15-7021

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 6:13-CV-00429-RAW)**
_____

Joseph R. Farris, Franden, Woodard, Farris, Quillin & Goodnight, Tulsa, Oklahoma
(Michael L. Carr and Jane R. Cowdery, Holden & Carr, Tulsa, Oklahoma, with him on
the briefs), appearing for Appellant.

Chandra L. Holmes Ray (John P. Zelbst and David L. Butler, with her on the brief),
Zelbst, Holmes & Butler, Lawton, Oklahoma, appearing for Appellee.
_____

Before **MATHESON**, **BALDOCK**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

     In 2012, O.K. Farms, Inc. hired J.B. Hunt Transportation, Inc. ("Hunt") to deliver

chickens to Roger Gentry, a poultry grower with a farm near Wister, Oklahoma. Hunt, in

turn, hired truck driver Troy Ford to deliver the chickens. On August 12, 2012, friends and relatives of Mr. Gentry were present to help him receive the delivery, among them, Jimmy Hill ("Jimmy"). As Mr. Ford drove into the chicken house on a Moffett, a vehicle similar to a forklift, he hit Jimmy's leg and injured his ankle. Jimmy's ankle became infected, and he died on December 2, 2012.

Michael Hill, Jimmy's son and the special administrator of his estate,[1] brought a wrongful death action in Oklahoma state court against Hunt, alleging it was vicariously liable for Mr. Ford's negligent driving. Hunt then filed a notice of removal based on diversity of citizenship, *see* 28 U.S.C. §§ 1332, 1441, and the case was removed to the United States District Court for the Eastern District of Oklahoma. Mr. Hill subsequently amended his complaint, adding O.K. Farms as a defendant.

A few days before trial, Hunt's counsel discovered Mr. Ford was unwilling to appear at trial, despite having been subpoenaed. On the second day of trial, Hunt moved the court to compel Mr. Ford's appearance at trial or, alternatively, to admit his video deposition testimony. The district court denied Hunt's motion. The jury returned a $3.332 million verdict against Hunt.[2]

---

[1] We refer to Michael Hill, the named plaintiff, as Mr. Hill and to Jimmy Hill as Jimmy.

[2] Before the case was submitted to the jury, O.K. Farms moved for judgment as a matter of law under Federal Rule of Civil Procedure 50. The district court granted its motion.

Hunt moved for a new trial or, alternatively, remittitur under Federal Rule of Civil Procedure 59(a) and (e), arguing (1) the court's decision not to compel Mr. Ford's appearance and its exclusion of his deposition testimony prejudiced Hunt, and (2) the jury award was excessive and unsupported by the evidence. The district court denied Hunt's motion.

Hunt appeals from the final judgment and the denial of its Rule 59 motion. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  *Additional Factual History*

O.K. Farms had hired Aaron Mize to help Mr. Ford transport the chickens. He and Mr. Gentry testified to the events preceding the accident. According to both, Mr. Ford had a blind spot to his front right as he drove the Moffett into Mr. Gentry's chicken house. Mr. Mize and Mr. Gentry stood near the Moffett and helped direct Mr. Ford. Mr. Gentry instructed Mr. Ford to pull forward. As Mr. Ford drove forward, Jimmy crossed paths with the Moffett. Mr. Mize yelled for Mr. Ford to stop, but it was too late. Mr. Ford had already hit Jimmy.

Jimmy's ankle was fractured on the day of the accident. He underwent an operation on September 10. His ankle became infected, and he was re-admitted to the hospital on October 10. On October 24, a second surgery removed the infected hardware in his ankle. He was then transferred to long-term acute care ("LTAC") on October 30, where he was treated with intravenous antibiotic therapy. While in the LTAC unit, he

contracted fungal sepsis. He died on December 2. Additional details regarding the accident and Jimmy's decline in health are discussed as relevant below.

### B. *Procedural History*

**1. Mr. Ford's Refusal to Appear Pursuant to the Parties' Subpoenas**

In September 2014, Mr. Hill issued a subpoena ordering Mr. Ford to appear at trial, which was set to begin on Tuesday, October 28. Hunt's counsel accepted service of all subpoenas, including this one, on behalf of Hunt's employees, unaware Hunt had terminated Mr. Ford in May 2014. Before trial, Hunt submitted a witness list that included Mr. Ford's name, but Hunt did not include Mr. Ford's video deposition testimony in its deposition designations due two weeks before trial under one of the court's pre-trial scheduling orders.

Six days before trial, on Wednesday, October 22, Hunt's attorneys learned Mr. Ford had been terminated. They immediately called him to confirm his willingness to appear as a witness, but Mr. Ford told counsel he refused to appear. Hunt's counsel therefore issued a subpoena on Friday, October 24. That same day, Hunt's paralegal met with Mr. Ford in person and attempted to persuade him to come to trial. Hunt's counsel continued calling Mr. Ford throughout the weekend, but he insisted he would not come.

On Monday, October 27, the day before trial, Hunt served both Mr. Hill's September subpoena and its own October subpoena on Mr. Ford. According to the server's affidavit, Mr. Ford told the server, "I already told them everything I am going to tell them. I'm not going. I'm going to take this [witness fee] check and cash it but I am not showing up." *Id.* at 330, 334 (punctuation altered).

2. **The Denial of Hunt's Trial Motion to Compel Mr. Ford's Appearance or Admit His Deposition**

On the first day of trial, both Mr. Hill's and Hunt's counsel informed the court for the first time that Mr. Ford refused to appear at trial. On the second day, Hunt moved for a bench warrant for the arrest and delivery of Mr. Ford to the court.[3] Alternatively, it moved to admit Mr. Ford's deposition under Federal Rule of Evidence 804(A)(5)(a). The court called Mr. Ford to attempt to "cajole him" into appearing, but he did not answer. *Id.* at 890.

The district court denied both requests. First, it declined to order the Marshals to deliver Mr. Ford to the court, reasoning Mr. Ford lived over 120 miles away from the courthouse; there was a "slim" chance he would be at home because he was an over-the-road truck driver, App. at 889; and attempting to compel his appearance would disrupt

---

[3] More specifically, Hunt filed a "Motion to Require Witness to Obey Subpoena to Attend Trial," requesting an order requiring Mr. Ford "to appear and testify as a witness for" Hunt. App. at 335. Although the motion requested an "order to show cause requiring TROY FORD to appear and testify as a witness in this action," we understand Hunt to have requested a bench warrant. *Id.* at 336. In his oral statements to the district court, Hunt's counsel asked the court to "dispatch the Marshals to bring Mr. Ford here pursuant to the subpoena." *Id.* at 1104; *see also id.* at 884 ("[W]e would love for you to send the marshals to get him and drag him up by the scruff of the neck."); *id.* ("What we have said in our motion . . . is either send the marshal to get him, . . . or declare him unavailable pursuant to Rule 804 . . . ."). The court's ruling during trial similarly addressed whether to dispatch the Marshals. And Hunt repeats similar language on appeal. *See* Aplt. Br. at 33 (referring to the district court's decision "not to send the Marshals to compel Ford's attendance"). We therefore construe Hunt's motion as a request for a bench warrant for the Marshals to arrest Mr. Ford and deliver him to the court.

trial. Second, the court excluded Mr. Ford's deposition testimony because Hunt had failed to include it in its deposition designations.

3. **Verdict Against Hunt**

The jury found in favor of Mr. Hill, attributing 98% of the negligence that caused the accident to Hunt and 2% to Mr. Gentry, a non-party. It awarded Hill $3.4 million, to be reduced by Mr. Gentry's 2% fault, yielding $3.332 million.

4. **Denial of Hunt's Rule 59 Motion for a New Trial or Remittitur**

Hunt moved for a new trial or, alternatively, remittitur under Rule 59(a) and (e). First, Hunt argued the court's refusal to compel Mr. Ford's appearance and its exclusion of his deposition testimony were prejudicial errors. Second, Hunt contended the jury award was excessive and unsupported by the evidence, warranting a new trial or remittitur of at least $2,900,000, for a total judgment of less than $500,000.

The district court denied Hunt's Rule 59 motion. First, it ruled the decision not to compel Mr. Ford's appearance was warranted for the reasons stated during trial. Second, it reaffirmed the exclusion of Mr. Ford's deposition testimony was proper. It added any error would have been harmless because the admissible evidence from Mr. Ford's deposition was cumulative of other trial testimony. Finally, the court affirmed the jury award, rejecting Hunt's argument that the damages were excessive or unsupported by the evidence.

## II. **DISCUSSION**

We affirm. First, because the district court acted within its discretion when it declined to issue a bench warrant, its denial of a new trial on this ground was not an

abuse of discretion. Second, because any error the court may have made in excluding Mr. Ford's deposition did not affect Hunt's substantial rights, its denial of a new trial on this ground was not an abuse of discretion. Third, the court acted within its discretion in upholding the jury award.

### A. Standard of Review for Rule 59 Rulings

We review denials of Rule 59(a) and Rule 59(e) motions for abuse of discretion. *Elm Ridge Expl. Co. v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013). "A district court abuses its discretion if it made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1178 (10th Cir. 2011) (quotations omitted). As noted below, the same standard of review—abuse of discretion—applies to each error Hunt alleges occurred during trial.

### B. The Decision Not to Issue a Bench Warrant

1. **Standard of Review**

We review a court's decision on whether to issue a bench warrant for abuse of discretion. *See United States v. Simpson*, 992 F.2d 1224, 1230 (D.C. Cir. 1993) ("[A] decision to issue a bench warrant to compel the appearance of a witness lies within the trial judge's discretion . . . ."); *United States v. Cherry*, 940 F.2d 653, at *4 (4th Cir. 1991) (unpublished) ("Considering the cumulative testimony and the fact that the witness was not subpoenaed until well into the trial, we cannot say the trial court abused its discretion by refusing to issue a bench warrant and grant the concomitant continuance.").

A district court generally has the "inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).

2. **Analysis**

Mr. Ford disobeyed two subpoenas. His actions as the driver of the Moffett determined whether Hunt was liable. Nonetheless, we cannot say the district court abused its discretion in declining to issue a bench warrant for him. The court had "inherent authority to manage" the trial. *See id.* Its decision to deny a bench warrant was a reasonable exercise of this authority because: (1) Hunt first informed the court of Mr. Ford's refusal to appear on the first day of trial; (2) the distance between Mr. Ford's home and the courthouse was considerable; (3) Mr. Ford might not have been home because he was a truck driver; (4) problems in finding him might have necessitated a mid-trial continuance; (5) the judge tried to call Mr. Ford and could not reach him; and (6) his deposition testimony was available.

Hunt contends the district court underestimated the likelihood Mr. Ford would be home in that (1) he was unemployed; (2) the subpoena server found him at home one day before trial; (3) Hunt's paralegal met with Mr. Ford the Friday before trial; and (4) Hunt's counsel spoke with Mr. Ford by phone throughout the weekend before trial.

It took Hunt three days to fully articulate this argument. On the first day, Hunt's counsel represented he had learned of Hunt's termination only a few days earlier. He explained Mr. Ford told the server he refused to appear at trial. And he described Mr. Ford as an "independent truck driver" without further specifying his current employment status. App. at 719.

- 8 -

The district court responded, "I am highly skeptical that we are going to find the gentlem[a]n. . . . [I]f he is an over-the-road truck driver, he may live in Oklahoma, but he is probably not here." *Id.* at 721. Hunt's counsel responded, "The process server had no problem serving him [on the Monday before trial]. They knew right where he is and they went to him and he told the process server I am not coming." *Id.* at 721-22.

On the morning of the second day of trial, Hunt moved for a bench warrant or admission of Mr. Ford's deposition testimony. Its written motion stated Hunt's counsel had called Mr. Ford. It did not state whether counsel called his home phone or cell phone. Hunt's counsel orally represented to the court that he had "sent [counsel's] paralegal down last Friday to meet with him." *Id.* at 882-83. But he did not specify where she met with Mr. Ford. In short, neither its written motion nor its oral argument fully responded to the court's concern that Mr. Ford might not be home.

The court restated its concern two more times that day. First, it said, "I am not going to send a Deputy United States Marshal down to Southeastern Oklahoma, . . . especially him being an over-the-road trucker. The chances of him being found, I think, are slim. I think it would be a complete waste of time and terribly interrupts the flow of this trial." *Id.* at 889. It then suggested this ruling was tentative, stating the court would itself "give him a phone call . . . [to see if it could] cajole him" into appearing. *Id.* at 890. Later that day, the court called Mr. Ford. When Mr. Ford did not answer the phone, the court ruled it would not send the Marshals on "some wild goose chase down to find him." *Id.* at 1009. Hunt did not respond to the court's concern regarding the likelihood of Mr. Ford's being home.

The court reviewed and confirmed its ruling on the third day of trial. Hunt then stated for the first time that Mr. Ford was at home when counsel spoke with him by phone and that he was still unemployed.

In sum, Hunt first informed the court Mr. Ford would not appear on the first day of trial. The court repeatedly expressed concern that dispatching the Marshals might be fruitless because Mr. Ford might not be home. Hunt took three days to spell out its full argument that Mr. Ford would likely be home. Not until the third day of trial did it present a developed argument that Mr. Ford would likely be home.

Given the timing and presentation of these arguments and the six reasons stated above, we cannot say the district court abused its discretion in denying a bench warrant or in denying a new trial on this ground.

### C. *The Exclusion of Mr. Ford's Deposition*

Hunt contends the district court erroneously excluded Mr. Ford's deposition testimony. Mr. Hill argues (1) Hunt failed to preserve this objection because it failed to make a timely or adequate offer of proof; (2) the district court committed no error; and (3) any error was harmless. We affirm because any error would not have affected Hunt's substantial rights.

1. **Standard of Review**

We review a district court's exclusion of evidence for abuse of discretion, but we do so only if the appellant has preserved the issue through an adequate and timely offer of proof. *Perkins v. Silver Mountain Sports Club & Spa, LLC*, 557 F.3d 1141, 1146 (10th Cir. 2009); *see* Fed. R. Evid. 103(a) ("A party may claim error in a ruling to . . . exclude

evidence only if . . . a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.").

If the district court abused its discretion in excluding the evidence, we then determine whether the exclusion was harmless, and we reverse only "if the error affects a substantial right of the party." Fed. R. Evid. 103; *see also McInnis v. Fairfield Cmtys, Inc.*, 458 F.3d 1129, 1142 (10th Cir. 2006) ("[W]e will not set aside a jury verdict unless the [evidentiary] error prejudicially affects a substantial right of a party." (quotations omitted)). "An error affecting a substantial right of a party is an error which had a substantial influence or which leaves one in grave doubt as to whether it had such an effect on the outcome." *McInnis*, 458 F.3d at 1142 (quotations omitted). When determining whether an error was harmless, "we review the record as a whole." *Id.* (quotations omitted).

## 2. **Hunt's Rule 59 Motion and the District Court's Ruling**

Following the jury verdict, Hunt filed its Rule 59 motion, contending the court should have admitted Mr. Ford's deposition under Federal Rule of Evidence 804, asserting Mr. Ford was "absent from trial" and Hunt's counsel was unable "by process or other reasonable means, to procure . . . [his] attendance." Fed. R. Evid. 804(a)(5)(A). It also argued the court should have admitted Mr. Ford's deposition under Federal Rule of Civil Procedure 32(a)(4)(E), which states, "A party may use for any purpose the deposition of a witness . . . if the court finds . . . that exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance of live

- 11 -

testimony in open court—to permit the deposition to be used."  Finally, it argued the court's failure to admit Mr. Ford's deposition was prejudicial.

The district court denied Hunt's motion.  It ruled "exceptional circumstances" under Rule 32 did not exist and that the court had properly excluded the deposition based on Hunt's failure to include it in deposition designations due two weeks before trial.[4]  Finally, it reasoned a new trial was unwarranted in any event because the exclusion of Mr. Ford's deposition did not prejudice Hunt; the deposition "contained hearsay as to the conduct of [Jimmy] Hill, which hearsay would have been excluded, and was cumulative of points otherwise explored in other testimony and cross-examination."  App. at 512.

3.  **Analysis**

Although the record indicates Hunt may not have made an adequate or timely offer of proof to preserve its objection to the exclusion of Mr. Ford's deposition, we resolve this issue on the ground that exclusion did not affect Hunt's substantial rights.  The admissible evidence from Mr. Ford's deposition was cumulative of the testimony presented by Mr. Gentry and Mr. Mize—the only eye witnesses to the accident who testified at trial.[5]  To determine whether the exclusion of Mr. Ford's deposition prejudiced Hunt, we review the testimony of Mr. Gentry, Mr. Mize, and Mr. Ford.

---

[4] The court did not address Hunt's Fed. R. Evid. 804 argument.

[5] The only other trial witness who had been present in the chicken house was Theresa Milligan Hill, a relative of Jimmy.  She testified that, although she was present during the accident, she did not see Mr. Ford hit Jimmy.  She therefore offered no testimony regarding the events leading into the accident.

a. *Roger Gentry's Trial Testimony*

Mr. Gentry testified that, on the day of the accident, Mr. Ford arrived at his farm with a delivery of chickens from O.K. Farms. Five of Mr. Gentry's friends and relatives were present to assist with the delivery, including Jimmy, Mr. Gentry's wife's uncle. All of them had experience unloading chickens. He further testified as follows:

Q. Now, you were in the front telling him where to stop though, right?
A. Yes, sir.
. . . .
Q. Where were you when Uncle Jimmy Hill was hurt or injured? Where were you standing?
A. I was standing in front of the Moffett to the driver's left, my right.

App. at 853, 859. The court then admitted the following demonstrative exhibit.



*Id.* at 1305. Mr. Gentry testified that he, Mr. Ford, and Mr. Mize were standing in positions reflected in the exhibit.

His testimony continued:

Q: Is there any question in your mind that he was pulling forward and not backing out when Uncle Jimmy was hurt?
A. Yes, sir.
. . . .
Q. All right. Did you ask the driver Troy Ford — he came to a stop; is that correct?
A. Yes, sir.
Q. And did you ask him to pull forward a little further, a little bit more?
A. Yes, I did.
Q. Approximately how short was he? How much more did he need to pull in?
A. I just wanted him to pull forward maybe three or four feet.
Q. All right. Did he stop on his own without you telling him to stop when he originally stopped and then you told him he has got to come forward more?
A. He stopped on his own.
. . . .
Q. And then you said to come forward some more, right?
A. Yes, sir.
Q. All right. Where Troy Ford was sitting, was he able to see to his front and to the right, front right, from where he was sitting?
A. No, sir.
Q. It was blind, right?
A. Yes, sir.
Q. He was driving blind in pulling forward to his front right; correct?
A. Yes, sir.
. . . .
Q. Tell us what happens as Troy Ford pulls forward.
A. I heard someone yell back up, back up, and I believe it was that Aaron, Aaron Mize.
Q. Yes, sir.
. . . .
Q All right. When you heard back up, back up, was Troy Ford still pulling forward?
A. Yes, sir.
Q. He stopped pretty quick though, didn't he?
A. He stopped very quick, yes, sir.

. . . . .

Q. Did Aaron Mize do his job as a spotter and get that Moffett stopped before it ran into Uncle Jimmy?
A. No, sir.

. . . .

Q. Could Troy Ford from where he was sitting, could he see Jimmy Hill before he ran into him?
A. I don't believe so, no, sir.

*Id.* at 862-66.

On cross-examination, O.K. Farms' counsel inquired further about Mr. Ford's initial stop:

Q: . . . . Would it be fair to say, sir, that when the forklift pulls in and stops, that's generally the signal for all of the helpers or you, if you are in someone else's house, to move back in and start getting the chickens off to do the dumping?
A: Yes, sir.
Q: So it would certainly be reasonable to assume perhaps that [Jimmy] once this forklift stopped might have thought it is time to start throwing chickens and step forward to do that from wherever he was?
A: Yes, sir.

*Id.* at 920.

b. *Aaron Mize's Trial Testimony*

Mr. Mize testified he began working for O.K. Farms in June 2012. His job was "to open and close doors . . . to keep the temperature inside those trailers at a range where the chickens would still be healthy." *Id.* at 1061. Mr. Mize stated that, before the accident, he went into the chicken house. He further testified as follows:

Q. What made you go in there?
A. Because he said it was tight, so I offered—I said I will watch him.
. . . .
And make sure he didn't hit the [water]line.
. . . .
Q. Could Troy see in front of him? . . . .

- 15 -

A. You have a blind spot right here.

Q. To the right basically.

A. Yes.

Q. Front right, you can't see, right?

A. No.

Q. He knew that, right?

A. Yes.

Q. You knew that, right?

A. Yes.

. . . .

Q. This injury happened as Troy Ford is pulling forward; correct?

A. Correct.

Q. And you see this man who got run over at the last second; right?

A. Correct.

Q. And what was he doing?

A. It looked like he was moving like to get over the line.

Q. All right. Where were you located?

A. Behind the Moffett on the right.

Q. All right. You are behind the Moffett on the right; correct?

A. Correct.

Q. You are looking ahead; right?

A. Correct.

Q. You could see ahead of you; correct?

A. Correct.

Q. And you could look and see anything you wanted to in front of you, there is nothing obstructing your view; correct?

. . . .

A. True.

. . . .

Q. And the man who got run over, what did he look like he was doing?

A. It looked like he was trying to step over the waterline.

Q. And that's when the Moffett hit him; correct?

A. Yes, and that's when I said whoa.

Q. Okay. And Troy Ford stopped when you said whoa, didn't he?

A. Yes, but it was too late.

. . . .

A. . . . I was looking all around because I wasn't—I wasn't a full-blown spotter.[6]

---

[6] Mr. Mize later explained that by "full-blown spotter" he meant "somebody that is actually trained to be a spotter." *Id.* at 1000. When asked, "were you trained on any safety rules by O.K. farms?" he answered, "No." *Id.* at 988.

. . . . .
Q. . . . . So were you looking to the right?
A. Yes.
Q. Looking to the left?
A. Yes.
Q. Looking straight ahead?
A. Yes.
Q. Looking up?
A. Yes.
Q. Looking down?
A. Yes.
Q. So you really weren't just looking at the waterlines, were you?
. . . .
A. I mean, I wasn't—like I said, I wasn't dead set on watching, watching, watching, watching, watching. . . . .
. . . .
Q. Isn't it true that you have said in the past that Jimmy Hill came out in the front of it and that you couldn't see him at first?
A. Correct.
. . . .
Q. . . . .Where did he come from?  Do you know?
A. The front of the [Moffett].
Q. How do you know that if you couldn't see him?
A. Because of the way he was coming when I seen him.
Q. Do you know if he was on the left side of the [Moffett] and walked in front of it?
A. Yes.
. . . .
Q. So he must have come from the left, across the front and then stepped out. Does that sound fair?
A. Yes.
. . . .
Q. Do you recall that there was an investigator . . . from J.B. Hunt that came to the scene pretty quickly after the injury?
A. Yes.
. . . .
Q. Did you tell him that Jimmy Hill was standing on your side?
A. Yeah.
. . . .
Q. Well, if he was standing on your side, he didn't come out from in front of the Moffett, did he?
A. I guess not.

*Id.* at 983-85, 989-90, 992-97, 1046, 1051.

   c.  *Mr. Ford's Deposition Testimony*

Mr. Ford provided the following testimony regarding the training he received from

Hunt:

Q. So when you decide I want to go to work for J.B. Hunt, then tell me the steps you had to do to make that happen.
A. [I did] orientation down there in Dallas. We spent four days down there training and going through all kinds of stuff.
. . . .
Q. So you had road tests?
A. Yeah, yeah.
Q. Did you take classes or have to listen to speakers about safety issues?
A. We had to do all that and then we had to do the road test out on the road. Yeah, there's a lot to it.
. . . .
Q. After you finished your four days down there in Dallas, then they say you're hired?
A. Well, I came back up here and had to go through the Moffett and all that stuff. . . .
. . . .
Q. Did you do the Moffett training at Heavener[, Oklahoma]?
. . . .
A. Yes. . . .
. . .
Q. All right. So you get back to Heavener and you're going to have the Moffett training. Do you have to have that before they can put you out in the field?
A. Oh, yeah. I went through two weeks of training on the truck and the Moffett with another driver before I done anything.
. . . .
Q. When you were training on the Moffett, did you watch videos?
A. Yes. I have, yes.
. . . .
Q. Do you remember the name of the video[s]?
A. No, I don't remember the name of [them].
. . . .
Q. When you would watch these videos, would you have to take a test?
A. Yes.
Q. Did you pass your tests?

A. Yes.

Q. At any point in time in any of your two-week training at Heavener, did you fail any tests?

A. No.

Q. And would you actually get on a [Moffett] and have to drive and demonstrate for your supervisor?

A. Yeah, well, I did for that other driver and the supervisor there on the parking lot.

Q. So they teamed you up with another driver and you rode with him?

. . . .

A. Yes.

. . . .

Q. So you would ride with him and go deliver to the chicken houses?

A. Yes.

App. at 1376-85.

Mr. Ford testified that, on the day of the accident, he was accompanied by Mr. Mize, who was "summer help" hired by O.K. Farms, when he delivered the chickens to Mr. Gentry. *Id.* at 1397. He further testified:

Q. . . . . once you're loaded up, as a driver can you see where to go?

A. You can't see that right-hand side, no.

Q. When you say right-hand side, that's from where you're seated on the Moffett?

A. The seat sits on the left, you know, on them Moffetts. You can see down this side, part of your front, but you cannot see that other side.

Q. So when you're seated, looking forward, you have a blind spot to your right?

A. You have a blind spot.

. . . .

Q. . . . When you're headed up to the door of the barn to go into the house, when you kind of look at an angle to see what's in front of you that's going to be in your blind spot; is that right?

A. Yeah.

Q. Now, do you have a spotter?

A. Well, that's what Aaron was doing. . . . .

. . . .

Q. Do these guys, the summer help, are they trained as to what to do as a spotter?

A. No.

- 19 -

. . . .

Q. So when you're in this barn bringing in this load, tell me what happens in the incident with Mr. Hill.

A. . . . . I got up there close and started—I was slowing down real slow. That's the way you go. You just crawl in anyhow. But I was going to stop short. The owner over here, Gentry, was telling me to come on up, come on up. Aaron was over on this side watching, you know, supposed to be. But he had me ease on up, and we got—I guess he stepped over the waterline. I don't know. I can't see that side. I don't know what happened.

Q. But you know at some point in time after the fact that you ran over Mr. Hill's leg?

A. Well, he stepped over in front of the tire or something while—yeah. . . . it hit his leg.

Q. Now, you're telling me the owner—that's Mr. Gentry?

A. Yes.

Q. He was giving you hand motions?

A. Yes.

Q. He would have had to have been on your left side if you could see him?

A. He was on my left side.

Q. So he couldn't have been able to see what was going on on the right side then? . . . .

A. I mean, he could see more than I could, I thought. You know, I thought he probably could see.

Q. . . . Well, where in relation to you on the seat, how far was Mr. Gentry from you?

A. 8, 10 foot, I guess.

Q. Right next to you, in front of you, behind you?

A. No, he was in front of me.

Q. Would he have been in front of—

A. He was on the other end of the skid.[7]

Q. Was he all the way clear of the skid?

A. Yes.

Q. And Aaron was on your right side?

A. Uh-huh.

Q. Was he parallel like right next to you or behind you or do you know?

A. He was right at the end of the Moffett over there—

Q. To the right-hand—

. . . .

---

[7] Earlier in his deposition, Mr. Ford had described a skid as a structure holding the stacks of chickens that the Moffett picks up.

A. At the end of the hood of the Moffett.[8]  He could see—he ought to have been able to see anything over there, but I couldn't.

Q. There was nothing obstructing Aaron's view is what you're saying?

A. No, shouldn't have been.

Q. And his only job at that point in time in the barn was to be your spotter?

A. Yes, I mean.

Q. Was there any other reason he would be in the barn except to spot for you?

A. No, not really.

. . . .

Q. So when you're going forward, you're going forward all the way almost to the curtain, that's when this happened, before you even started unloading that skid?

A. Yeah, when he motioned me to come on forward.

Q. And that was Roger Gentry motioning you?

A. Uh-huh. The owner, whatever his name is.

Q. And at some point in time did Aaron Mize say or do anything?

A. Yeah, he hollered—when he hollered stop, we had already caught that ole boy's leg.

. . . .

Q. When he hollered stop, did you know what you had hit?

A. No.

Q. Did you know you had hit anything?

A. No, I didn't know what I did.

Q. But you knew you hit—

A. He told me.

Q. My question is when he hollered stop, did you feel something, that you had run over something?

A. No.

. . . .

Q. . . . .  As soon as you get off the Moffett, what do you see?

A. Him laying over the waterline.

. . . .

Looked like he had tripped over the waterline is what he looks like, you know.

*Id.* at 1400-05, 1410-11, 1416.

---

[8] Mr. Ford had previously testified that the skids are located in the front of the Moffett.  This testimony suggests the hood is located in the back of the Moffett, which is similarly depicted in the diagram admitted during Mr. Gentry's testimony.

When asked further about Mr. Mize's role in the incident, Mr. Ford stated, "Maybe he glanced off or something when he wasn't supposed to. But anyhow, I can't see that side. He was supposed to have been watching. I don't know." *Id.* at 1418-19.[9]

d. *Cumulative Evidence Analysis*

Mr. Ford's deposition testimony was cumulative of Mr. Gentry's and Mr. Mize's trial testimony. All three testified to the same basic facts: Mr. Ford drove the Moffett into the chicken house toward his blind spot; Mr. Gentry guided Mr. Ford from the front left of the Moffett; Mr. Mize spotted him from its back right; and Mr. Ford hit Jimmy.

The inferences of fault from Mr. Ford's testimony are also cumulative of the inferences from Mr. Gentry's and Mr. Mize's testimony. First, all three men's testimony could suggest Jimmy was at fault because they all said he stepped into the Moffett's path as it was moving toward him. Second, their testimony could suggest Mr. Ford was at fault because he drove directly into his blind spot. Third, their testimony could suggest Mr. Gentry was at fault because he directed Mr. Ford to move forward and then failed to warn him before he hit Jimmy. Fourth, their testimony could suggest Mr. Mize was at fault because he inadequately monitored Mr. Ford and failed to warn him of Jimmy's movements in time. Mr. Ford additionally suggested Mr. Mize may have "glanced off"

___

[9] In its Rule 59 order, the district court concluded Mr. Ford's deposition "contained hearsay as to the conduct of [Jimmy] Hill, which hearsay would have been excluded." *Id.* at 512. We agree. Mr. Ford testified, for example, that after the accident, Jody Herbert, one of the individuals helping Mr. Gentry with the delivery, told Mr. Ford that Jimmy "was where he didn't need to be at the time" of impact. *Id.* at 1413. We agree with the district court that such statements are inadmissible and should be disregarded for the purposes of our harmless error analysis.

at the moment of the accident. *Id.* at 1418.[10]  But Mr. Mize also testified he was "looking

all around." *Id.* at 992.  Finally, Mr. Ford suggested O.K. Farms was at fault for failing

to train Mr. Mize to spot Mr. Ford.  Mr. Mize also testified O.K. Farms had not trained

him how to spot.

In short, the facts and inferences available from Mr. Ford's testimony were

cumulative of those from Mr. Gentry's and Mr. Mize's trial testimony.[11]  The exclusion

of Mr. Ford's testimony therefore does not undermine our confidence in the outcome of

trial, and we find no prejudice to Hunt's substantial rights.

e. *Hunt's Arguments*

Hunt's remaining arguments are unpersuasive.  Hunt contends the absence of Mr.

Ford's testimony made it appear "like Hunt had something to hide, or, in the alternative,

that Hunt just did not care," particularly because counsel suggested during opening

statements that Mr. Ford might appear, and at least one witness referenced Mr. Ford's

---

[10] We question the admissibility of this testimony because the record suggests he was speculating and lacked personal knowledge.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

[11] The converse is not true.  Mr. Mize and Mr. Gentry did testify to facts not included in Mr. Ford's deposition testimony.  For example, Mr. Gentry's testified regarding the signaling effect of Mr. Ford's initial stop, and Mr. Mize offered inconsistent testimony regarding Jimmy's exact position at the moment of impact.  This testimony is immaterial for the purposes of our cumulative evidence analysis because it extends beyond the scope of Mr. Ford's testimony and is therefore irrelevant to whether Mr. Ford's testimony was cumulative of testimony offered at trial.

deposition.  Aplt. Br. at 41.[12]  Hunt relatedly argues "the jury was angered by not hearing from Hunt's participant in the 'affray,' and took any frustration or anger out on Hunt." *Id.*

To show the exclusion of Mr. Ford's deposition affected its substantial rights, Hunt must do more than make speculative and unsubstantiated assertions of juror anger. It must show how Mr. Ford's deposition testimony might have affected the outcome in light of other evidence in "the record as a whole."  *McInnis*, 458 F.3d at 1142.  It fails to do so.  For this same reason, Hunt's conclusory assertion that Mr. Ford's "appearance would be a human face on the allegations of liability against Hunt, a corporate entity" is unavailing, Aplt. Br. at 33, an argument that makes even less sense as applied to use of the deposition.

Hunt also contends it was prejudiced because Mr. Ford was the "only witness with 'on-site' knowledge of the specific conditions, actions and movements of those present, and decisions made at the time of the accident."  *Id.* at 32.  But Mr. Gentry and Mr. Mize testified to specific conditions, actions, movements, and decisions made at the time of the

---

[12] In Mr. Hill's opening statement, counsel stated, "We hope Troy Ford is going to be here.  We were told that he maybe didn't want to come, but hopefully he will come and tell us what happened."  App. at 591.  In Hunt's opening statement, counsel stated, "Troy Ford will tell you" certain facts.  *Id.* at 595.  Finally, Mr. Hill's expert witness Jason Jupe, a forensic engineer, indicated he reviewed various eyewitnesses' depositions—including Mr. Ford's—to reconstruct the accident.  Hunt additionally asserts, "Ford's deposition testimony was used as the basis for testimony from other witnesses, including . . . Gentry."  Aplt. Br. at 41.  But Mr. Gentry's testimony does not contain references to Mr. Ford's deposition testimony.

accident based on personal knowledge. Hunt's assertion is further belied by Mr. Ford's series of answers, stating "I don't know."[13]

Finally, Hunt argues Mr. Ford's deposition would have addressed "how the more-than-sufficient training Hunt provided him figured into his conduct." *Id.* at 32-33. Mr. Ford testified he received four days of training in Dallas, including a road test, and weeks of additional Moffett training in Oklahoma, including videos. He said that he passed every test during training and drove a Moffett in front of his supervisor.

Hunt does not explain, nor can we discern, how this testimony could have influenced the outcome in light of the other evidence admitted at trial. Hunt fails to explain how Mr. Ford's testimony about his training "figured into his conduct," *id.*, or affected the outcome of trial.

Based on the foregoing, we conclude the record does not show the exclusion of Mr. Ford's deposition testimony prejudiced Hunt. We therefore affirm the district court's denial of Hunt's Rule 59 motion on this issue because the court did not abuse its discretion.

### D. *The Jury Award*

We also affirm the district court's denial of Hunt's motion for a new trial based on the jury award or, alternatively, remittitur.

---

[13] *See, e.g.*, App. at 1396, 1403, 1405-09, 1411, 1413-15, 1417-19.

1. **Standard of Review and Legal Background**

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). In evaluating jury awards more specifically, federal district courts sitting in diversity apply state law "controlling compensation awards for excessiveness or inadequacy." *Id.* at 419; *see also Prager v. Campbell Cty. Memorial Hosp.*, 731 F.3d 1046, 1062 (10th Cir. 2013) ("[S]tate law governs the propriety of an award of damages—that is, whether it is excessive or inadequate." (quotations omitted)). Appellate review of a district court's ruling on a jury award is "limited to review for abuse of discretion," *Gasperini*, 518 U.S. at 419, a standard rooted in the Seventh Amendment, which governs proceedings in federal but not state courts, *id.* at 432.

a. *Federal Abuse of Discretion Standard*

"We review the district court's decision to deny a new trial or remittitur under an abuse of discretion standard." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1251 (10th Cir. 2000). "In order to establish an abuse of discretion, the party that moved unsuccessfully for a new trial on the basis of an excessive verdict carries the heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence." *Hynes v. Energy W., Inc.*, 211 F.3d 1193, 1206 (10th Cir. 2000) (quotations omitted). We consider a jury's "determination of fact is considered inviolate" absent an award "so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Id.* (quotations omitted). We do so because

[t]he jury holds the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact. It is a fundamental legal principle that the determination of the quantum of damages in civil cases is a fact-finder's function. The jury, who has the first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages, pursuant to the court's instructions, deemed proper to fairly compensate the injured party.

*Prager*, 731 F.3d at 1063 (quotations and citations omitted).

Finally, "[a]s the reviewing court, we must view the evidence in the light most favorable to the prevailing party." *Whiteley v. OKC Corp.*, 719 F.2d 1051, 1058 (10th Cir. 1983); *see also Prager*, 731 F.3d at 1063 ("[T]he amount of damages awarded by a jury can be supported by any competent evidence tending to sustain it." (quotations omitted)).

b. *Oklahoma Law Regarding the Excessiveness of a Jury Award*

Under Oklahoma's wrongful death statute, recoverable damages include "[m]edical and burial expenses," the "mental pain and anguish suffered by the decedent," and the "grief and loss of companionship of the children and parents of the decedent." Okla. Stat. Ann. tit. 12, § 1053(B).

The Oklahoma Supreme Court has acknowledged the difficulty of quantifying damages based on pain and suffering and loss of companionship. *See Carraco Oil Co. v. Morhain*, 380 P.2d 957, 959 (Okla. 1963) ("There is no yardstick by which the loss of companionship can be measured . . . . " (quotations omitted)); *Denco Bus Lines v. Hargis*, 229 P.2d 560, 563 (Okla. 1951) ("[T]here is no market where pain and suffering are bought and sold, nor any standard by which compensation for it can be definitely

ascertained, or the amount actually endured determined." (quotations and brackets omitted)). Oklahoma law accordingly only "supports the granting of a new trial where the inadequacy or excessiveness of an award, in and of itself, evidences that the passion and partiality inhering in it are so clear as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous." *West v. Bd. of Cty. Comm'rs of Pawnee Cty.*, 273 P.3d 31, 32 (Okla. 2011).

2. **Evidence of Damages, Jury Instructions, and Jury Award**

   a. *Evidence of Jimmy's Decline in Health and Death*

Mr. Hill's infectious disease expert, Dr. Steven O'Marro, reviewed Jimmy's medical records and testified that Jimmy was a smoker and suffered from various pre-existing medical conditions, including diabetes, high blood pressure, and obstructive pulmonary disease. The accident fractured Jimmy's ankle. He underwent an operation on September 10. At his follow-up appointment on October 5, his pain was increasing, and his wound was not healing well. His doctor noted the possibility of osteomyelitis, meaning a bone infection, and stated the infected plate in Jimmy's ankle may need to be removed. The pain and pain medications, in turn, interfered with Jimmy's diet and digestion, exacerbating his diabetes, increasing his blood sugar levels, and causing constipation.

On October 10, Jimmy was admitted to the hospital and never left. His records note decreased cognition, a urinary tract infection (UTI), two kinds of bacteria in his ankle, constipation, diarrhea, ischemic colitis, chronic liver inflammation, sepsis, and low blood pressure. His right ankle was draining puss, and there was a deep lateral opening.

Jimmy's physicians began to administer total parenteral nutrition ("TPN")—intravenous nutrition—because of his difficulty eating.

On October 24, Jimmy underwent a second surgery to remove the infected hardware in his ankle. Jimmy was transferred to long-term acute care ("LTAC") on October 30, where he was treated with intravenous antibiotic therapy. While in the LTAC unit, he contracted fungal sepsis, which is yeast in the blood, and was admitted to the intensive care unit. He died on December 2. His death certificate stated the immediate cause of death was fungal sepsis, and the contributing cause was osteomyelitis.

Jimmy's medical bills, which were stipulated to by the parties and read to the jury, totaled $80,065.84. Jimmy's burial expenses were $2,695.

    b. *Mr. Hill's Testimony*

At trial, Mr. Hill testified he had a good relationship with his father. He grew up spending approximately every other weekend and many summers with Jimmy, as his parents were divorced. As an adult, Mr. Hill, who lived in California, spoke with Jimmy by phone about every month or every other month.

Beginning October 10, Mr. Hill contacted Jimmy or another family member every day regarding Jimmy's health. Sometime in November, Mr. Hill flew to Oklahoma and began visiting his father in the hospital every day. He testified it was "difficult" and "tough to see" his father, who looked like he had "aged a lot from the last time [he] had seen him." *Id.* at 1031. He had lost a "lot of weight," and "his leg wasn't as big around

as [Mr. Hill's] wrist." *Id.* Mr. Hill "wasn't completely prepared" to see Jimmy in such a state. *Id.*

Mr. Hill described the experience of packing up his father's belongings as "without a doubt the most difficult thing I have had to do." *Id.* at 1041. Jimmy was "[a]bsolutely" a role model to him, adding, "the kind of man that I am today, the kind of father I am today, I owe it all to him." *Id.* at 1040-41. Mr. Hill sought counseling after his father's death.

### c. *Jury Instructions and Jury Award*

The district court instructed the jury it could award damages based on the following:

1. The grief of Michael Hill;
2. The loss of companionship and parental care, training, guidance, or education that would have been forthcoming from Jimmy Hill to Michael Hill, and the loss of companionship of Jimmy Hill by Michael Hill;
3. The pain and suffering of Jimmy Hill;
4. The medical and burial expenses of Jimmy Hill.

App. at 381.

The jury awarded Mr. Hill $3.4 million. It found Mr. Gentry 2% at fault and Hunt 98% at fault. It therefore awarded Mr. Hill $3.332 million payable by Hunt.

### 3. **Analysis**

We affirm the district court's denial of Hunt's motion for a new trial based on the jury award or remittitur.

Hunt challenges the district court's decision on two grounds. First, it contends the jury granted an excessive award because the court refused to compel Mr. Ford's

- 30 -

attendance or admit his deposition testimony. We reject this argument for the reasons explained above. The court acted within its discretion in declining to issue a bench warrant, and any error it committed in excluding the deposition did not affect Hunt's substantial rights.

Second, Hunt contends the jury award was excessive, even assuming the district court committed no error regarding Mr. Ford. We disagree. Mr. Hill offered ample evidence from which the jury could assess Jimmy's pain and suffering, his medical bills, his burial expenses, and Mr. Hill's grief and loss of companionship. Hunt does not contest the admissibility of any of this evidence, nor does it challenge the court's damages instructions. It only argues the jury award was generally excessive. We find this argument unconvincing. The jury had wide latitude to choose an award based on the evidence. *See Prager*, 731 F.3d at 1063 ("The jury, who has the first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages . . . . " (quotations omitted)); *West*, 273 P.3d at 32 (explaining Oklahoma law only "supports the granting of a new trial" where a jury award is "beyond all measure unreasonable and outrageous"). And the district court had broad discretion to accept it. *See Hynes*, 211 F.3d at 1206 ("In order to establish an abuse of discretion, the party that moved unsuccessfully for a new trial on the basis of an excessive verdict carries the heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence." (quotations omitted)); *see also West*, 273 P.3d at 36 ("The judge who presides at the trial[;] hears the testimony; observes the witnesses; and has full knowledge of the proceedings during the trial process

. . . . is in the best position to know whether substantial justice has been done."). In only suggesting the award was excessive, Hunt fails to carry its burden.

Finally, Hunt suggests the award was excessive in light of damages awarded in a variety of other cases, most of which are from other states and circuits. We are unpersuaded. Both this court and Oklahoma courts discourage comparisons to awards from other cases.[14] Such comparisons "yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations." *Smith*, 214 F.3d at 1252. They also "detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence." *Id.* We have made exceptions where a previous case is similar enough to serve as a meaningful benchmark. *See Prager*, 731 F.3d at 1063 (comparing the jury award to a previous award where the facts of the two cases were "strikingly similar"); *Kelly v. Cann*, 136 P.2d 896, 901 (Okla. 1942) (explaining a previous award is only "worthy of consideration when sufficiently similar"). The cases cited by Hunt do not fall within this narrow category.

## III. CONCLUSION

For the foregoing reasons, we affirm.

---

[14] *See Dolenz v. United States*, 443 F.3d 1320, 1322 (10th Cir. 2006) ("We will not engage in a comparison of the challenged awards to awards for similar damages in similar cases."); *Whiteley*, 719 F.2d at 1058 ("Under Oklahoma law, each case with an excessive verdict issue must be reviewed upon its own facts and circumstances."); *Oklahoma Ry. Co. v. Strong*, 226 P.2d 950, 952 (Okla. 1951) ("No fixed criterion can be established for determining the amount of damages to be allowed for any particular injury to the human body. The amount to be awarded in any case depends upon the circumstances to be revealed therein, and the amount of verdicts approved in other cases cannot be considered as controlling.").